LANDRY, Judge.
Plaintiff, Pierre Meyers, instituted this action against defendant, The Employers Liability Assurance Corp. (sometimes hereinafter referred to simply as “Employers”), to recover workmen’s compensation benefits for alleged total permanent disability reputedly resulting from an accident purported to have occurred January 22, 1962, during the course of plaintiff’s employment as an ironworker by defendant’s assured, United Engineers & Constructors, Inc. The trial court awarded plaintiff compensation benefits for 300 weeks on finding plaintiff’s disability to be temporary total. From said unfavorable determination defendant has suspensively appealed. Plaintiff has devolutively appealed praying for 400 weeks compensation for total permanent disability together with penalties and attorney’s fees for defendant’s alleged arbitrary failure to pay any compensation whatsoever.
The instant appeal presents two questions for resolution, namely, the occurrence of an accident during the course and within the scope of plaintiff’s employment and whether plaintiff is in fact disabled by the low back injury asserted to have resulted therefrom.
In resisting plaintiff’s demands, defendant denies the occurrence of an accident and urges that plaintiff’s present condition is a residual of two similar accidents which occurred approximately eight or nine years previous and did not result in total permanent disability. In addition appellant maintains plaintiff’s symptoms, if any, are manifestations of hypertrophic arthritis antedating plaintiff’s prior accidents which happened in 1953 and 1954. Finally, the incidental suggestion of malingering is posed because of similarity between plaintiff’s present complaints and those following his former accidents, the equivalence of the several accidents, the conformability of the clinical findings in each instance, and plaintiff’s success in obtaining settlements following his former accidents.
Considering first the question of occurrence of an accident within the scope and course of plaintiff’s employment, we agree with the conclusion of our learned brother below that plaintiff has discharged the burden incumbent upon him of proving such an eventuality.
Plaintiff testified that on January 22, 1962, while assisting a fellow-employee, Douglas Kelly, in lifting an iron grating measuring approximately four by six feet and weighing between 250 and 300 pounds, he “jerked up on it” and immediately felt *660 a severe pain in his back. He remained on the job throughout the rest of the day but did no further work as he was unable to lift anything; his back was painful; he was nauseated; and he had a headache. The occurrence of the mishap was confirmed by plaintiff’s associate, Kelly, who testified that as he and plaintiff were lifting the grating, plaintiff suddenly cried out that he was hurt. Plaintiff’s foreman, Carl Clement, further substantiated the happening of the accident in that he testified plaintiff reported the accident to him the day it occurred. He further stated plaintiff did not return to work the following day and that the second day following the accident, January 24, 1962, plaintiff consulted a doctor.
Nothing in the record justifies disregarding the testimony of plaintiff and his fellow employees regarding the occurrence of the accident as related. That this type of occurrence constitutes an accident within the meaning of the Workmen’s Compensation Law is too well settled to require citation of authority.
Relying upon the authority contained in Card v. Southern Builders, Inc., La.App., 117 So.2d 675, and Windham v. W. Horace Williams Co., La.App., 18 So.2d 854 (and cases cited in said decisions), learned counsel for appellant stoutly maintains plaintiff’s present claim should be viewed with suspicion and examined with care with respect to any bearing or effect plaintiff’s pri- or accidents may have upon the present claim.
We hasten to add we are in complete agreement with the views expressed in the Card and Windham cases, supra, as the rules therein announced are necessary not only to prevent a possible miscarriage of justice in favor of a professional claimant, but also to satisfy the requirement of causal relationship between the accident and resulting disability for which the employer is vicariously liable by law. In Workmen’s Compensation cases, as in other civil actions, claimant bears the burden of proof and is required to establish his claim to a legal certainty by a reasonable preponderance of evidence. Mere possibility, and even unsupported probability are insufficient to support a judgment in claimant’s favor. Anderson v. Southern Fabricators Corp., La.App., 160 So.2d 438; Dours v. Travelers Ins. Co., La.App., 48 So.2d 817.
In Workmen’s Compensation cases, the burden incumbent on plaintiff includes the onus of establishing either that the disability resulted from injuries sustained in the course of his employment, or that the accident occurring in the course of his employment aggravated a pre-existing condition thereby producing disability. This does not mean, however, that the accident-prone employee cannot recover benefits for successive injuries. The law places no limit on the number of claims an employee may present. It does, however, require that in each instance the employee must establish disability causally related to a particular accident to support his claim to benefits.
 Esteemed counsel for appellant is correct, however, in stating that evidence of prior injuries and claims is admissible insofar as they bear upon any issue before the court, including by way of extension, cred- ' ibility of the claimant. To establish the required causal connection, particularly with regard to a claim of aggravation of a preexisting condition, all relevant factors relating to claimant’s physical condition anterior and posterior to the accident must be considered. Such evidence, however, is to be considered and weighed in the light of all admissible events and circumstances.
It is uncontraverted that on October 23, 1942, plaintiff sustained a small ventral hernia which resulted from abdominal strain exerted in moving a piece of iron. In settlement of his claim against his then employer, plaintiff received a lump sum payment of $600.00. At the trial of the instant matter, plaintiff’s said hernia (which by 1954 was described as a large epigastric hernia), had not been repaired. It appears, *661 however, this condition is totally unrelated to plaintiff’s presently alleged disability.
On May 1, 1953, plaintiff reputedly sustained a low back injury while using an iron pinch bar as a lever to straighten a column. Shortly thereafter, on July 17, 1953, while employed by another firm, plaintiff again avowedly experienced a back strain in the course of dragging an iron beam weighing approximately six or seven hundred pounds. Plaintiff instituted suit against both employers claiming compensation benefits for total and permanent disability. A compromise settlement of these claims resulted in a payment of $2,154.44 to plaintiff on March 17, 1955.
The reports of the medical authorities who examined plaintiff in connection with his initial prior injury were introduced in evidence pursuant to an agreed stipulation that if their authors were called as witnesses they would testify substantially in accord therewith. As argued by esteemed counsel for appellant, these reports show virtually the same signs and symptoms exhibited by plaintiff subsequent to the accident in question. Prognosis was optimistic as regarded plaintiff’s ultimate recovery. Plaintiff’s complaints were similar, and the X-rays taken revealed an old compression fracture of the twelfth thoracic vertebra and some resulting hypertrophic lipping of the opposing surfaces of T-12 and L-l vertebrae. A rotary scoliosis to the left was also disclosed by X-rays.
Counsel for appellant lays considerable stress on the similarity between the medical findings in 1953 and those in 1962-3 and has elaborated thereon in considerable detail by juxtaposing in parallel vertical columns the respective medical reports, testimony and subjective complaints related by plaintiff in each instance. We see no need, however, to further particularize the concordance between the circumstances attending the several claims. For purposes of the present discussion we may concede them to be identical. Irrespective of whether plaintiff was or was not disabled át the time of his compromise settlement in 1955, the record is clear beyond doubt he was sufficiently recovered some months later to return to his former occupation which he pursued without interruption, except for enforced lay offs due to lack of available employment, until the time of the accident herein sued upon. It is equally clear that during this period of employment plaintiff performed all aspects of his trade in the same manner as others similarly employed and without special consideration for his age or any possible residual physical disability. He obtained employment through his union in whatever jobs were available for whatever period of time the projects called for. By the very nature of his work (construction) he was never continuously employed by the same employer. From January 24, 1956, he was employed on eleven jobs ranging in duration from one day to a maximum of four months. During the two year period next preceding the present accident, he worked a total of six and one-half months.
At the time of the accident in question, plaintiff had been working for appellant’s insured for approximately two months as evidenced by his answers to defendant’s interrogatories. Douglas Kelly, who commenced work six weeks prior to the accident, testified plaintiff was already on the job when he, Kelly, was employed. Plaintiff’s acquaintance, Carl Clement, testified that when he started working for defendant’s assured four or five months prior to plaintiff’s accident, plaintiff was already on the job. In this Clement was obviously mistaken. In denying plaintiff’s claim for penalties and attorney’s fees, the learned trial judge concluded plaintiff was hurt the first day of his employment by appellant’s insured. In this we believe our esteemed colleague was mistaken considering there is nothing in the record to support such a deduction.
Adverting to plaintiff’s condition following the accident, we refer to the medical evidence consisting primarily of depositions and medical reports supplemented by the *662 oral evidence of one physician who testified at the trial below.
Two days after his injury plaintiff consulted Dr. Wade H. Sigmon, Jr. of Gonzales, Louisiana. It is not clear whether plaintiff sought treatment of Dr. Sigmon of his own accord or on the advice of an authorized agent or representative of appellant’s assured. By coincidence plaintiff was discharged on that date due to a general reduction in force but, as we view the record herein, nothing can be inferred from this confluence of said circumstances. Based on an examination which included X-rays, Dr. Sigmon diagnosed plaintiff’s condition as a lumbosacral strain and concluded plaintiff was not disabled but would require conservative treatment for a period of three or four weeks. Plaintiff returned to Dr. Sigmon’s office daily from January 29 to February 10, and on February 12, 13, 14, 20 and 28 for a total of eighteen visits for treatment consisting primarily of diathermy and the administration of mild pain relieving drugs. Because plaintiff’s complaints of low back pain persisted despite the diathermy treatments, Dr. Sigmon referred plaintiff to Dr. William E. Smith, Orthopedist, on February 11, 1962. Although plaintiff still complained of pain when Dr. Sigmon last saw him on January 28, 1962, Dr. Sigmon nevertheless advised plaintiff to return to his former occupation.
Predicated on his examination of plaintiff on February 11, 1962, Dr. Smith rendered a report of his findings. After detailing the patient’s complaints, history and appearance, Dr. Smith’s report states:
“Physical examination of the low back at this time reveals the normal lum-bosacral lordosis to be present. There is no noted scoliosis of the thoracic or lumbosacral spines. There is a good range of motion in the lumbosacral spine at this time with the patient complaining of some discomfort in the right lower portion of his back to all extremes of motion. There is no detectable paraspinous muscle spasm in the low back area to examination at this time. There is a normal reversal of the curve to active bending motions. The pelvis is level to clinical determination. The leg lengths are equal to coinical measurement, measuring 36 inches in length bilaterally as measured from the anterior superior iliac spines to the medial malleoli. The right thigh measures 1724th inches in circumference as measured at a point 5 inches above the superior pole of the right patella; the left thigh measures 17^4 inches in circumference at a similar point. The knee joints are equal in circumference, measuring 1324th inches in circumference bilaterally as measured at the mid-patellar points with the knee joints extended. The calves are equal in circumference, measuring 1324 inches in circumference bilaterally as measured at points 5 inches below the inferior poles of the patellae. There is a full range of motion in all the major joints of both lower extremities with no complaint of pain to the extremes of motion. The straight leg raising sign is negative bilaterally. The Faber Test is negative bilaterally. The pelvic rocking test is negative. There is no evidence of motor or sensory deficit in either of the lower extremities. Reflexes as tested at the patellar, achilles, posterior tibial, and peroneal areas are active and equal bilaterally. The dorsalis pedis and posterior tibial pulses are palpable and equal bilaterally. There are no unsual coloration or temperature changes of the feet. The Babinski sign is negative bilaterally.
“X-rays were taken of this patient’s, lumbosacral spine in my office on February 16, 1962 in the AP, lateral, both oblique, and spot lateral lumbosacral junction views. These X-rays demonstrate no evidence of recent or old fracture, dislocation, or significant traumatic bony pathology. There are-changes consistent with early hyper— *663 trophic arthritis of the lumbosacral spine.
“I am unable to detect any objective evidence of significant orthopedic pathology in this patient’s low back or lower extremities at this time which could be explained on the basis of trauma which he sustained in January of 1962. I feel that he is capable of returning to his former occupational duties as an iron worker.”
On April 26, 1962, approximately three months following the accident, plaintiff was seen by Dr. James F. Halley, orthopedic surgeon, who, upon examination found plaintiff suffering from a mild spasm of the lumbar musculature. X-rays taken pursuant to Dr. Halley’s instruction revealed mild wedging of the anterior border of T-12 and L-l vertebrae together with some arthritic changes about the anterior borders which deformities and changes appeared to be of long duration. (In this regard it is worthy of note that these same conditions likewise appeared on X-rays taken in 1953). Dr. Halley also observed a mild scoliosis of lumbar vertebrae with the apex of the curvature to the left side at the level of L-l and L-2. (This condition also existed in 1953.) Based on his initial examination Dr. Halley was of the ■opinion plaintiff had suffered a lumbo-sacral strain which was subsiding and ■should continue to improve. Plaintiff was also seen by Dr. Halley on May 17, 1962, at which time plaintiff still complained of back pain. Dr. Halley was still of the opinion the pain would subside in a few ■weeks. Dr. Halley saw plaintiff for the ■third and last time on May 28, 1962. Plaintiff recited susbtantially the same com■plaints as before and Dr. Halley recom-mended plaintiff to do some light work to ■strengthen his back.
Dr. George B. Briel, orthopedic surgeon, •examined plaintiff on August 7, 1962, pursuant to referral of plaintiff’s attorney. IDr. Briel found plaintiff had a pelvic tilt to the left, some flattening of the lordotic curve and a slight scoliotic curve to the left in the lumbar region. He also noted a mild dorsal kyphosis and a tightness in plaintiff’s lower back muscles. Tests conducted by Dr. Briel disclosed plaintiff could flex his back only 40 degrees with no reversal of the lordotic curve, flexion being accomplished by complaints of pain in the lumbosacral region. Extension, lateral bending, and rotation were observed to be limited. Tenderness was observed over lumbar spines 4 and 5 at the right lumbosacral angle and the right sciatic notch. Right patellar and achilles reflexes were found to be sluggish. Roentgeno-graphs disclosed mild rotoscoliosis in the left lumbar region. Old hypertrophic changes were found in the lower lumbar vertebral bodies and it was also noted that the lumbosacral disc interspace was pos-teriorly narrowed to moderate degree. Dr. Briel believed the hypertrophic arthritic changes present had taken place over a period of years and he considered them commensurate with a man plaintiff’s age.
In summary Dr. Briel found paraverte-bral muscle spasm and limitation of back motion which suggested the possibility of pressure on the right sciatic nerve at the level of the lumbrosacral disc interspace. At this time Dr. Briel was of the opinion plaintiff could not return to the type of work plaintiff described in explaining the duties of an ironworker.
Dr. Briel re-examined plaintiff October 12, 1962, and reached the same conclusions as before. However, at this time he felt his prior diagnosis of possible sciatic nerve pressure suggesting a protruding inter-vertebral disc, was not substantiated, and he was of the opinion plaintiff’s condition and history were more suggestive of the probability of aggravation of hypertrophic arthritic changes in the back. Dr. Briel prescribed a metal Knight type brace which he felt would reduce the inflammatory condition noted and improve plaintiff’s existing state.
*664 Plaintiff, however, did not obtain the back brace until more than three months after Dr. Briel recommended its use. On March 8, 1963, after he had been wearing the brace for approximately two months, plaintiff returned to Dr. Briel. Examination revealed plaintiff had derived considerable relief and improvement from use of the prescribed brace. On this occasion Dr. Briel observed plaintiff no longer had a list of the lumbar vertebrae or a pelvic tilt. The scoliotic curve was minimal and there was no kyphosis. Although the muscles in plaintiff’s lower back were tight, there was no definite spasm. Plaintiff’s patellar reflexes were active and apparently equal. Dr. Briel’s final diagnosis was aggravation of some arthritic changes, or possibly a lumbo-sacral strain, which was still disabling on the date of plaintiff’s last visit. He could not say how long thereafter plaintiff would continue to be disabled. In Dr. Briel’s opinion, if plaintiff’s initial trauma involved injury to the ligaments and muscles of the low back, plaintiff might never recover sufficiently to resume his employment as ironworker. This hypothesis was not established with any degree of certainty and the observations made by Dr. Sigmon immediately following the accident eliminate it entirely.
Assuming plaintiff’s condition resulted from arthritic changes, as believed by Dr. Briel, plaintiff could be expected to have remissions of symptoms during which he could perform considerable work if he protected his back, on the other hand, he might experience exacerbations of symptoms. Such remissions and exacerbations could occur solely from natural causes in cases involving hypertrophic osteoarthritis, notwithstanding the complete absence of traumatic influence. In plaintiff’s case, however, Dr. Briel felt the condition noted was definitely exacerbated by traumatic incident.
Dr. Briel further stated plaintiff’s subjective complaints on his third examination were out of proportion to the objective findings. He noted this condition particularly with regard to the stocking-type hy-poesthesia without dermatone pattern of which plaintiff complained. Dr. Briel felt these particular complaints were not necessarily exaggerations, but rather a mild type of hysteria or disturbance of plaintiff’s psyche, resulting from plaintiff’s excessive preoccupation with his condition. In this connection it is to be noted that plaintiff has made no contention or offered any evidence whatsoever to establish disability resulting from traumatic neurosis.
One phase of Dr. Briel’s testimony deserves closer scrutiny because of its susceptibility of misinterpretation if taken out of context, but reveals the nature of plaintiff’s condition when considered with other testimony of this witness. We refer to the following testimony of Dr. Briel:
“Q Was the condition in which you saw this man on these three examinations, consistent with a history of pain free work for several years prior to this incident which he related to you as occurring in January of 1962? In other words, Doctor, if the man had had this condition in the state of development in which you saw him when you examined him, could he have worked without complaint for several years at heavy lifting, climbing, etc., required of an iron worker?
“A I don’t see how he could have done it.”
We do not construe the above testimony contradictory of Dr. Briel’s diagnosis of long standing hypertrophic arthritis but rather he merely meant the aggravated condition of plaintiff’s arthritis could not have been present during the years plaintiff was performing heavy work prior to the accident herein sued upon. We believe this apparent from the following testimony given by Dr. Briel:
*665 “Q Did you find that your findings on your initial examination and subsequent examinations, and the relief he obtained from the brace, were these consistent with your diagnosis and the history related to you by the patient of the onset of his condition and its subsequent course?
“A Yes. I felt that the history that he gave of lifting this rather heavy object and the subsequent pain and inability to use his back was consistent with the possibility of an aggravation of possibly pre-exist-ed arthritis or of a lumbosacral strain with subsequent changes in the fibrous tissue, the muscle tissue of the lower back, which would prolong his condition.”
On April 6, 1963, plaintiff was examined by Dr. John D. Jackson, neurosurgeon. X-rays disclosed an old compression fracture of the 12th thoracic and 1st lumbar vertebrae which was unrelated to plaintiff’s complaints. Dr. Jackson did not make a notation of hypertrophic arthritis as revealed by X-ray. He concluded that either there was none or arthritis was present in such minimal degree as to be considered inconsequential. This testimony is clearly contrary to the overwhelming weight of medical evidence which shows long existing hypertrophic arthritis in marked degree. We believe this discrepancy to be explained by the testimony of Dr. Jackson to the effect that he is a neurosurgeon and not an orthopedic surgeon and considering the arthritis insufficient to cause neurological damage he regarded it as ineffective and inconsequential from the view of the neurologist. Dr. Jackson found plaintiff unable to reverse the normal lumbar curvature and also noted limitation of the lumbar spine in all directions. X-rays disclosed a scoliosis of the lumbar spine indicative of more muscle spasm on the left than on the right. Dr. Jackson deemed these findings consistent with plaintiff’s complaints of pain and was of the opinion exercise and straining would aggravate this condition. The occasional headaches and neck pains of which plaintiff complained were consistent with the findings noted. In all other respects, Dr. Jackson’s neurological examination of plaintiff was essentially normal. At the time of the examination plaintiff related he was unable to do heavy manual labor. Dr. Jackson felt it was abnormal for the pain to have persisted over such a protracted period but acknowledged that in plaintiff’s case “it seems to have continued.” While Dr. Jackson considered plaintiff was improving, he could not venture a prognosis. Dr. Jackson stated that if plaintiff’s condition did not continue to improve he would recommend a myelogram to determine if plaintiff had a protruding disc nodule causing the complaints. He predicted, however, that a myelogram would prove negative thereby corroborating his diagnosis of chronic paravertebral muscle spasm. His testimony does not indicate the neurological condition found was in any way connected with the accident in question.
Finally, on August 9, 1963, plaintiff consulted Dr. Jerome W. Ambrister, orthopedic surgeon, on the recommendation of plaintiff’s attorney. Dr. Ambrister examined plaintiff as a follow-up on the work of his associate, Dr. Briel, who was at that time on leave from his medical practice. X-rays taken pursuant to Dr. Ambrister’s direction disclosed additional hypertrophic arthritic changes of the cervical region. He was of the opinion plaintiff’s complaints of pain were attributable to hypertrophic arthritis in the neck and low back areas. Dr. Ambrister could express no opinion regarding whether the trauma of January 22, 1962, aggravated the previously existing condition. On the other hand, he felt the changes observed could be consistent with a history of heavy work without pain prior to the trauma of 1962. He was of the further opinion plaintiff’s complaints were consistent with the conditions found, but that the complaints were exaggerated. Dr. Ambrister replied in the negative when asked if he could state with any degree of *666 medical certainty that plaintiff would recover sufficiently to return to his trade of ironworker without experiencing considerable pain and discomfort.
Asked specifically whether plaintiff could return to work, Dr. Ambrister responded:
“The man is sixty-one years of age. I think that he could probably do such. However, when it comes to repeated heavy lifting over a long period of time, I would think he would have a recurrence of his back pains.”
We construe the foregoing testimony, viewed in the light of plaintiff’s long standing history of hypertrophic arthritis which has on several occasions been aggravated by trauma to the extent of causing back pains, to mean the likelihood of a similar accident and conforming sequelae occurring again is predictable. The record discloses, however, plaintiff’s arthritis itself was not disabling and it antedated the accident in question.
The record as a whole leads to the conclusion plaintiff’s existing arthritis was aggravated by the accident of January 22, 1962, although objective symptoms did not appear when Doctors Sigmon and Smith examined plaintiff. Apparently objective manifestations did not occur until Dr. Briel detected muscle spasm.
While the medical evidence is conflicting on the question of plaintiff’s ability to continue his former employment without appreciable pain, we believe the preponderance thereof favors the conclusion plaintiff can no longer perform the arduous labor required of an ironworker whose duties involve considerable climbing, stooping and heavy lifting without experiencing considerable discomfort. Granted, plaintiff has had former similar injuries, it nevertheless remains that he recovered therefrom and was able to resume his employment for a period of several years without incident until the occurrence of the accident in question which activated his then dormant arthritis. In this regard the record shows that after his previous accidents plaintiff returned to work and performed all of the duties of his trade-without assistance, special consideration or being assigned “light duty.” It was not until after the accident of January 22, 1962,. that plaintiff’s inactive arthritic condition, was rendered active and resulted in the disability which ensued.
Though the consensus of medical' opinion is to the effect plaintiff’s condition, seems to be improving, nevertheless the record shows he was disabled at the time of trial and none of the experts were able to-fix a definite period for the duration of suck disability. Under such circumstances plaintiff was entitled to an award of compensation during the continuance of his said disability not exceeding 400 weeks, subject to-the employer’s right of examination at six month’s intervals. It is settled jurisprudence in this state that where an injured employee establishes his disability, he is entitled to compensation during such disability, not exceeding 400 weeks, unless the employer shows recovery will be effected within a fixed period of time. Peavy v. Calcasieu Paper Co., La.App., 70 So.2d 755; Sloan v. Cochran & Franklin Co., La.App., 7 So.2d 213.
In view of the entire circumstances attending the present case, especially the initial medical reports which indicated plaintiff was not disabled, we do not deem defendant’s failure to pay compensation arbitrary or unreasonable. On this basis we hold that the trial court properly rejected plaintiff’s claim for penalties and attorney’s fees.
The trial court awarded plaintiff judgment for certain medical expense which we do not deem it necessary to detail herein. In this regard the judgment of the lower court will be affirmed.
Accordingly, the judgment of the trial court awarding plaintiff compensation at the rate of $35.00 weekly for a period of 300 weeks is hereby amended and revised and judgment rendered herein declaring *667 plaintiff totally and permanently disabled and as such entitled to compensation benefits from defendant, The Employers Liability Assurance Corp., in the sum of $35.00 weekly, during such disability, not to exceed •400 weeks, commencing January 22, 1962, together with interest on all past due weekly installments at the rate of five (5%) per cent per annum from date of delinquency, ■until paid. In all other respects the judgment of the trial court is affirmed, all costs to be paid by appellant, The Employers Liability Assurance Corp.
Amended and affirmed.