629 So.2d 1359 (1993)
John M. RONQUILLO, Jr.
v.
BELLE CHASE MARINE TRANSPORTATION, INC., et al.
No. 93-CA-0047.
Court of Appeal of Louisiana, Fourth Circuit.
December 16, 1993.
*1360 Gino J. Rendeiro, Weeks, Kavanagh & Rendeiro, and William L. Stroud, James Minge & Associates, New Orleans, for plaintiff-appellant.
Derek A. Walker, Brent A. Talbot, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for defendant-appellee.
*1361 Before KLEES and LANDRIEU and DIXON, J. Pro Tem.
JOHN A. DIXON, Jr., Judge Pro Tem.
In this maritime personal injury action, plaintiff, John Ronquillo, appeals a judgment in his favor against defendant, Belle Chase Marine Transportation, Inc. (BCM).

FACTS:
On September 19, 1989, Mr. Ronquillo, a crewboat captain employed by BCM, was injured on the BCM vessel, M/V ROOSTER II. The ROOSTER II, stationed at BCM's Alabo St. wharf, carried crew, passengers and supplies to vessels in the Mississippi River. While checking the oil level in the vessel, Ronquillo slipped on oil on the deck plates in the engine room and fell, injuring his back. After this incident, he never returned to work at BCM. Ronquillo sued BCM under the Jones Act and general maritime law, claiming that the unseaworthiness of the vessel and the negligence of BCM in failing to properly maintain its vessel, caused his injury.
Ronquillo suffered back injuries previously in two automobile accidents, ten and thirteen months prior to his slip and fall on the ROOSTER II. At the time of the ROOSTER II accident he was being treated by Dr. Raul Diaz, an orthopedic surgeon, for a herniated disc caused by one of the car accidents. Dr. Diaz's diagnosis after the ROOSTER II injury was lumbar strain and aggravation of his previously herniated disc. Ronquillo subsequently underwent two surgeriesa discectomy and a discectomy and a fusion. BCM paid Ronquillo maintenance and cure until July 1991 when Ronquillo's neurosurgeon, Dr. Toussaint Leclercq, found that he had reached maximum medical cure.
A jury heard Ronquillo's case against BCM and determined that an accident had occurred on the ROOSTER II and that BCM was negligent under the Jones Act. The jury awarded Ronquillo $20,000 for pain and suffering, $33,000 in past lost wages and nothing for future lost wages. The parties stipulated the amounts for past and future medical expenses$36,093.97 and $1,980.00 respectively. The jury assessed fault to Ronquillo of 45% and to BCM of 55%. Judgment was entered on September 3, 1992, awarding Ronquillo $30,239 plus interest and costs from the date of judicial demand.

ARGUMENTS:
On appeal Ronquillo raises six assignments of error. BCM answered the appeal, asserting one trial court error.

I
Ronquillo claims the Trial Judge abused his discretion by allowing BCM to cross-examine him about his prior automobile accidents, specifically about the claims he made in other lawsuits.
Before trial and in response to plaintiff's motion in limine, the Trial Judge ruled that while BCM could not introduce pleadings and other papers filed in plaintiff's other lawsuits, BCM could cross-examine him about his prior injuries and damages he sustained in the earlier accidents. Although plaintiff's counsel introduced the subject of Ronquillo's earlier accidents in his opening statement, Ronquillo claims that BCM's cross-examination on the earlier accidents and the resulting lawsuits clearly prejudiced the jury against him.
BCM's questioning was not as extensive as plaintiff indicates nor was BCM's intent to try to show that any of Ronquillo's claims were fraudulent or that he was a chronic litigator. Rather, because Ronquillo, in direct examination, testified that his back problem never prevented him from working and that the effects of his prior injuries were minimal and had been resolved, BCM properly used the evidence to impeach Ronquillo. The portion of the cross-examination at issue is as follows:
Q. Isn't it correct that you claim as a result of your August, '88 accident that you suffered amongst other things bodily injuries, mental anguish, medical expenses, loss of earnings, and permanent disability?
A. Yes, sir.
Q. And are you aware that you filed a claim with respect to that in August of 1989?
* * * * * *
[A.] Yes, sir.

*1362 Q. As a result of your second car accident, are you aware that you similarly claimed as late as May 12th, 1989 that you were suffering bodily injuries, pain and suffering, mental anguish, medical expenses, and loss of earnings capacity and permanent disability?
A. Yes, sir.
Q. May, 1989 is after the ROOSTER II; is that right?
A. No, sir.
Q. I'm sorry, several months before the ROOSTER II.
A. Yes, sir.
Q. It's correct, isn't it, that in this lawsuit you filed against Belle Chasse that you're claiming essentially the same things that you claim arose out of those first two car accidents?
A. Yes, sir but things were completely different as far as the amount of pain and all that I was in.
Q. Are you aware that as a result of the second car accident you claimed on February 15th, 1990, several months after the ROOSTER II that, in fact, you suffered a herniated disk and that you were a candidate for surgery and that you worked in considerable pain as a result of that accident? I'm speaking of the second car accident.
A. I work through whatever I had, yes, sir.
Plaintiff cites Daigle v. Coastal Marine, Inc., 482 So.2d 749 (La.App. 1st Cir.1985), writ granted, 488 So.2d 679 (La.1986), on remand 500 So.2d 823 (La.App. 1st Cir.1986), to support his argument that BCM's cross-examination was prejudicial. In Daigle, defense counsel questioned the plaintiff in detail about his seven previous back injuries and the monetary amounts he had claimed in each of his lawsuits. Additionally, the sum total of the claims paid to plaintiff was announced to the jury. The court noted that there had been no showing of fraud or similarity of the accidents except that each involved plaintiff's back. Therefore, the court held, the evidence prejudiced the jury in its finding of percentage of fault as well as damages and "affected substantial rights of plaintiff." 482 So.2d at 751.
The instant case, where the amounts plaintiff had claimed for damages in previous cases were not discussed and where defense counsel did not go into detail about the other lawsuits, is distinguishable from Daigle. Given plaintiff's testimony on his previous injuries, the questions involving the types of claims he made in other lawsuits were properly used to impeach plaintiff and involved the issue of his credibility.
Although Daigle is the closest case on this issue, defendant presents several cases which are similar and contain language which is helpful. For example, in Ewell v. Schwegmann Giant Supermarkets, 499 So.2d 1192, 1195 (La.App. 5th Cir.1986), the court noted:
[E]vidence of prior injury and claims is admissible insofar as they bear upon any issue before the court, including credibility, and to establish whether the disability is causally related to the particular accident. Meyers v. Employers Liability Assurance Corp., 176 So.2d 658 (La.App.1965). Thus, plaintiff's objection on grounds of irrelevancy to the trial judge's admitting into evidence testimony of his past injuries is also without merit.
In Page v. Guidry, 506 So.2d 854, 857 (La. App. 1st Cir.1987), the court found no error in the lower court's admission into evidence of settlement agreements from plaintiff's two earlier accidents. The court noted:
[T]he settlement agreements were admissible to show that the medical expenses claimed by plaintiff in this suit had already been submitted for recovery in the settlements reached by plaintiff with State Farm and Miller's. In fact, plaintiff's veracity and credibility were questioned by the fact that he had submitted the same medical bills in both settlements and was now seeking recovery for these costs for a third time. Therefore, we find that the settlement agreements, with the amount of each deleted therefrom, were properly admitted as an aid in the jury's apportionment of damages caused by the various accidents and in the jury's determination of the plaintiff's credibility and veracity.
*1363 Overall, given Ronquillo's trial testimony and that Daigle is distinguishable, defense counsel's limited questioning aimed at impeaching Ronquillo's earlier testimony does not seem so overly prejudicial as to constitute an abuse of discretion in allowing the questioning.

II
In another assignment of error, Ronquillo claims that the jury's verdict awarding $20,000 in general damages and zero for future earnings impairment is below the lowest amount which could reasonably be awarded to him.
To determine the appropriateness of the general damage award, it is necessary to review the medical evidence. Dr. Diaz, plaintiff's orthopedist before and after the boat accident, concluded that Ronquillo suffered a disc injury in one of the 1988 car accidents which was temporarily aggravated by his accident on the ROOSTER II. Examining Ronquillo two days after the vessel accident, Dr. Diaz noted that plaintiff had complaints of increased pain but he found no marked muscle spasm. Dr. Diaz recommended strict bed rest for several weeks. Whereas he had discussed surgery with Ronquillo as a possibility before the September 1989 injury, after the accident, Dr. Diaz felt that Ronquillo would definitely need surgery. Dr. Diaz's notes show that plaintiff had continued to complain of back pain at every visit prior to the Sept. 1989 accident.
Dr. Toussaint Leclercq, a neurosurgeon and the doctor who operated on plaintiff twice, saw Ronquillo three months after his accident on the ROOSTER II. Based on plaintiff's recounting of his history and having viewed an MRI from before the ROOSTER II incident, Dr. Leclercq found a herniated disc and recommended surgery. After surgery, Ronquillo still experienced pain, so Dr. Leclercq operated again and performed a bone fusion. As of January 1991, Dr. Leclercq felt that plaintiff had a 10-15% total body impairment. His restrictions were from stooping, bending and lifting weights. In July 1991, Dr. Leclercq determined that he had reached maximum medical improvement; he would not, however, be able to return to his previous work.
Ronquillo also saw a psychiatrist, Dr. Adrian Blotner, after his surgeries. Dr. Blotner's initial diagnosis was major depression secondary to pain and resulting from his physical limitations. Dr. Blotner reported that plaintiff was upset over his loss of ability to work as a boat captain. Additionally, he believed plaintiff had a narcotic dependency for two months after surgery.
Plaintiff was seeing Dr. Blotner monthly at the time of trial. And, although he felt that plaintiff's condition had improved through treatment, Dr. Blotner believed he would need 1 or 2 years more treatment with medication. At his deposition one year and four months before trial, however, Dr. Blotner had said then that plaintiff would require 1 to 1½ years more treatment.
From the history provided to him by plaintiff, Dr. Blotner felt that all plaintiff's psychiatric problems were associated with the September 1989 injury. Acknowledging plaintiff's past episodes of depression, Dr. Blotner felt these did not play a role in this depression since the prior episodes were resolved and not causing functional impairment.
BCM presented testimony from Dr. Charles Stewart, a psychologist who had treated plaintiff approximately four years before his vessel injury. Dr. Stewart's testimony basically added that plaintiff had reported to him in 1987-88 that he had a wide range of anxieties and depression throughout his life. Dr. Stewart could not say that plaintiff's symptoms had completely resolved and that whenever there was a specific major loss to him, he might have a tendency to fall apart.
The general damage award of $20,000 is low. Assuming, however, that the jury found that the September 1989 accident caused only a temporary soft tissue aggravation of injuries plaintiff received in the earlier auto accidents, then there is no abuse of the jury's broad discretion in assessing damages.
The jury was aware that surgery was discussed even before the vessel accident and that the surgery would have been the same before or after the accident. And, despite *1364 plaintiff's obvious attempts to minimize the effects of the car accidents, the doctor's records show continuing complaints of pain and use of pain medication before the vessel accident. Although plaintiff provides cases with high damage awards, this plaintiff is still dealing with an injury which was caused by another accident and only aggravated in the vessel accident. See, Wilson v. US Fire and Casualty Co., 593 So.2d 695, 703 (La.App. 4th Cir.1991), writs denied, 597 So.2d 1027 and 1037 (La.1992); cf. Mitchell v. Fire and Casualty Ins. Co., 540 So.2d 352 (La.App. 1st Cir.), writ denied 541 So.2d 1390 (La.1989). The "aggravation", moreover, is only verified by plaintiff's own subjective complaints of pain, and the doctors admitted having to rely on a history provided to them by plaintiff.
The jury could have believed that plaintiff's psychological injuryhis depression was a life-long condition. The tenor of Dr. Blotner's testimony was that plaintiff's emotional condition was tied to his employment status. Most of his problem seemed to stem from the fact that he could no longer be a boat captain. The doctors' testimony, however, indicated that with his back problem, he should not have been working in that capacity before the vessel accident.
Dr. Blotner and two vocational counselors testified that given Ronquillo's background, interests and abilities, his prospects for employment in a variety of fields, some of which would allow him to earn more than he was earning as a boat captain, are excellent. Ronquillo testified that there was nothing preventing him from working and that, in fact, he considered his writing short stories as work. Hence, the jury could have determined that had plaintiff sought employment after Dr. Leclercq found him at maximum medical cure (July 1991), his emotional problems would have subsided then. There was a basis in the record for the jury to have found that plaintiff's claimed emotional injury was not compensable.
Considering the medical testimony, plaintiff's testimony about his readiness to work, as well as the vocational counselors' testimony on his prospects for employment, the record provides no basis for an award of loss of future earnings.

III
In another assignment of error, plaintiff argues that the jury's finding of Jones Act negligence, proximate cause and unseaworthiness without finding the unseaworthy condition to be a proximate cause of his injury is an irreconcilable conflict which should be reversed.
On the jury interrogatories, the jury found that BCM was negligent under the Jones Act and that this negligence played a part, no matter how slight, in causing the injury. The jury determined that the ROOSTER II was unseaworthy but that the unseaworthy condition was not a proximate cause of plaintiff's injury. The jury found that the accident was 100% attributable to negligence and 0% attributable to unseaworthiness. The significance of this finding is that had the jury found a percentage attributable to an unseaworthy condition, that percentage of the judgment would be subject to pre-judgment interest. See, Theriot v. J. Ray McDermott & Co., 742 F.2d 877, 883 (5th Cir.1984).
BCM's first response that the Jones Act and unseaworthiness have distinctly different standards of proof is off point. BCM, it seems, confuses the plaintiff's featherweight burden of proving the employer's negligence with the burden of establishing that the employer's negligence, no matter how slight, was the proximate cause of the accident. There is not an appreciable difference between the plaintiff's burden of proving that either the negligence or the unseaworthiness caused the accident.
BCM's second responsethat the act which the jury found to be negligent was not necessarily the same condition that resulted in its finding of unseaworthinessis persuasive. Basically, plaintiff's argument that the jury's answers to the interrogatories are irreconcilable is based purely on speculation and therefore meritless.

IV
Ronquillo assigns error to the jury's assessment of his fault at 45%, claiming the assessment is contrary to the evidence and *1365 based on an improper jury charge. The testimony as a whole, and Ronquillo's testimony in particular, provide a basis for the jury's assessment of fault.
Ronquillo acknowledged having vast experience with boats, having obtained his captain's license in 1980. He admitted that his most important concern as a captain was for the safety of his crew, passengers and himself. He also admitted that if he did not consider a boat safe, the proper course of action is not to use it. He described the amount of oil that he saw on the deck plates before he walked on it and slipped as "an unnatural amount." He considered walking on the deck plates unsafe, but he "did it anyhow."
To minimize his fault, Ronquillo highlights testimony from some of the boat captains suggesting that cleaning the oil would be futile because the condition would return once the engines were started. Some of these same captains, however, testified that if they were confronted with oil on the deck plates as plaintiff was, they would clean the deck plates off before walking on them.
Plaintiff argues that proceeding into an unsafe area alone is not enough to support a finding of negligence on the part of a seaman and cites Ceja v. Mike Hooks, Inc., 690 F.2d 1191, 1195 (5th Cir.1982). As the court in Ceja observed in footnote 4, "If however, the unsafe condition is one which the seaman had the ability to rectifyas one of his own creation or otherwisehe may be deemed negligent in any injury thereby resulting."
There is ample testimony, including from plaintiff, that it was the captains' responsibility to clean and maintain the boats on a daily basis. Plaintiff's failure to perform his duty to clean the boat, walking over deck plates upon which he clearly saw water and/or oil, is sufficient to support the jury's assessment of fault to him.
Ronquillo complains that the Court's jury charge on a captain's responsibility is an incorrect statement of the law. Assuming plaintiff did not waive his objection to the charge[1], we find that plaintiff was not prejudiced by the use of the jury charge. The charge, based on Walker v. Lykes Bros. S.S. Co., Inc., 193 F.2d 772 (2nd Cir.1952), is:
If the plaintiff served as captain of the M/V Rooster II and as part of the duties of his employment was charged with maintaining the vessel in a safe and seaworthy condition, then he cannot create or permit a dangerous situation to continue, and then make a claim for an injury that resulted solely from the dangerous condition that he himself created or permitted to exist.
This charge is correct since it only bars recovery if the plaintiff's injury resulted solely from the dangerous conditions that he permitted to exist. In this case, however, the jury found that Ronquillo was only partially at fault. This assignment of error is meritless.

V
Ronquillo also assigns error to the jury's answer to an interrogatory denying him entitlement to maintenance and cure. He blames the jury's answer on the Trial Judge's jury instruction for maintenance and cure which plaintiff calls confusing:
Cure is defined as the cost of medical attention and treatment. Maintenance is defined as the cost of food and lodging and transportation to and from a medical facility. Maintenance may be recovered only if the seaman proves he has incurred living expenses while undergoing treatment.
The requirement that a seaman's employer provides maintenance and cure to an injured seaman continues until such time as it appears that the seaman has reached the point of maximum medical recovery. Maximum medical recovery means the point at which no further improvement in the seaman's condition can be reasonably expected.
If you find that plaintiff is entitled to an award of damages under the Jones Act/negligence claim, and if you either include an award for loss of wages or medical expenses, then maintenance and cure *1366 cannot be awarded for the same period of time. There can be no double recovery.

There is nothing erroneous or confusing about the instruction. Apparently, the jury's negative response meant that BCM did not have to pay the psychiatrist's bills from July 1991 (when plaintiff reached maximum medical cure) to the date of trial.
Ronquillo, however, did not properly object to the instruction at trial. To preserve an objection to a jury charge for appeal, a party must specifically object at trial and state the reasons for the objection. A general objection is insufficient. Bourgeois v. Puerto Rican Marine Management, Inc., 589 So.2d 1226 (La.App. 4th Cir.1991), writs denied, 592 So.2d 1299 and 1300 (La.1992).
At any rate, the testimony still supports the jury's denial of maintenance and cure, meaning that BCM was not responsible for Dr. Blotner's treatment after plaintiff had reached maximum medical cure. There is ample evidence for the jury to have concluded that had plaintiff attempted to find a job at that point, his psychological problems would have dissipated. BCM is, however, responsible for future medical expenses with Dr. Blotner because that is what it stipulated to before the jury began deliberating and what was entered on the jury form by the Judge without objection.

VI
Ronquillo's final assignment of error is likewise without merit. He complains that the jury's verdict was tainted because the juror who later became the jury foreman took the other jurors out to lunch at Ruth's Chris Steak House, where he is the vice-president. Plaintiff claims the foreman exercised undue influence over the other jurors. The juror, however, offered on the record to take the other jurors to lunch. The Trial Judge had a conference with the attorneys and asked if they had any objections. When neither attorney objected, the Judge gave permission for the arrangement.
Plaintiff's objection is without merit. Furthermore, plaintiff's counsel's discussion about an alleged conversation he had with a supposedly-unduly influenced juror was never brought up in the Trial Court and should not be considered on appeal.

BCM'S ASSIGNMENT OF ERROR:
BCM filed an answer to plaintiff's appeal, assigning error to the Trial Judge's award of pre-judgment interest to plaintiff. This award should be deleted.
In a jury trial, the issue of pre-judgment interest under general maritime law must be submitted to the jury. The trial judge, who is not the trier of fact, has no authority to grant an award of pre-judgment interest. Smith v. Two R Drilling Co., Inc., 606 So.2d 804, 815 (La.App. 4th Cir.), writ denied, 607 So.2d 560 (La.1992). Furthermore, when the plaintiff does not prevail on his unseaworthiness claim and recovers only under the Jones Act, he is not entitled to prejudgment interest. Theriot, supra.
In this case the issue of pre-judgment interest was not submitted to the jury, and the plaintiff did not recover for unseaworthiness. The Trial Judge erred in awarding pre-judgment interest.

CONCLUSION:
Plaintiff's assignments of error do not merit reversal of the jury verdict. Accordingly, the judgment of the Trial Court is affirmed, deleting the award for pre-judgment interest.
AMENDED AND AFFIRMED.
NOTES
[1] Plaintiff claims to have objected to the charge at "charge conferences;" such conferences are, of course, not a part of the record on appeal.