992 So.2d 465 (2007)
Terrell PARFAIT
v.
TRANSOCEAN OFFSHORE, INC., and Shell Oil Products Co.
Nos. 2004-CA-1271, 2005-CA-0174.
Court of Appeal of Louisiana, Fourth Circuit.
August 10, 2007.
*467 Michael X. St. Martin, Conrad S.P. Williams, III, Charles C. Bourque, Jr., St. Martin, Williams and Bourque, Houma, LA, Darryl M. Phillips, Philips & Mitchell, LLC, New Orleans, LA, for Plaintiff/Appellee, Terrell Parfait.
Timothy W. Cerniglia, Colvin Weaver & Cerniglia, New Orleans, LA, for Defendant/Appellant, Transocean Offshore USA, Inc./Shell Offshore, Inc.
Timothy W. Cerniglia, Sean M. Casey, Colvin Weaver & Cerniglia, New Orleans, LA, for Defendant/Appellant, Shell Offshore, Inc.
*468 (Court Composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge DENNIS R. BAGNERIS, SR., Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR., Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO, JR., Judge ROLAND L. BELSOME).
LEON A. CANNIZZARO, JR., Judge.
On remand from the Louisiana Supreme Court[1], the court en banc was ordered to reconsider the opinion previously rendered by a panel of five judges of the court in Parfait v. Transocean Offshore, Inc., XXXX-XXXX, XXXX-XXXX (La.App. 4 Cir. 1/05/07), 950 So.2d 8. The Supreme Court vacated the prior judgment, finding the five-judge panel did not reach a majority judgment on all issues.
The defendants, Transocean Offshore USA, Inc. and Transocean Offshore Ventures, Inc. (collectively referred to as "Transocean") and Shell Offshore, Inc. ("Shell"), had appealed from a trial court judgment rendered in favor of the plaintiff, Terrell Parfait, for damages he had sustained in a work-related accident.
After oral argument and reconsideration of the matter by the court en banc, the decision of the court as to the issues raised on appeal is summarized as follows:
It is the unanimous decision of the court that the plaintiff was entitled to a jury trial;
It is the unanimous decision of the court that the jury was clearly wrong in finding Shell negligent and the judgment against it must be reversed;
It is the unanimous decision of the court that the trial court did not abuse her discretion or err in allowing the expert testimony of Mr. David Williams and Mr. Robert Borison[2];
It is the unanimous decision of the court that the trial court did not abuse her discretion or err in limiting the cross-examination of Mr. Borison;
It is the unanimous decision of the court that the trial court did not abuse her discretion or err in allowing the plaintiff to introduce evidence of Shell's other drilling projects;
Nine judges, i.e. a majority of the en banc panel (Chief Judge Armstrong and Judges Jones, Murray, McKay, Bagneris, Love, Lombard, Cannizzaro and Belsome) find no manifest error in the jury's finding Transocean negligent;
Three judges of the court (Judges Kirby, Tobias and Gorbaty) find the jury was clearly wrong in finding Transocean negligent and would reverse the judgment against it;
Five judges of the court (Judges Jones, McKay, Bagneris, Love, and Cannizzaro) would grant a de novo review because the trial court erred in excluding evidence of Mr. Parfait's earlier injury;
Four judges of the court (Chief Judge Armstrong and Judges Murray, Lombard and Belsome) find the trial court did not abuse her discretion or err in excluding evidence of the plaintiff's earlier injury;
As to the damages, six judges of the court (Chief Judge Armstrong and Judges Jones, Murray, Bagneris, Lombard and *469 Belsome) would affirm the jury award of $1,701,029.11;
Two judges (Judges McKay and Love) would reduce the jury award to $1,312,979.11.
One judge (Judge Cannizzaro) would reduce the jury award to $712,029.11.

* * *
As the author of the original opinion, my opinion on remand is set forth below while the concurring and dissenting opinions of my fellow brethren follow.

FACTS
On April 23, 1999, Mr. Parfait was injured while working as a floor hand aboard the Transocean Rather ("Rather"), a semi-submersible drilling rig owned and operated by his employer, Transocean. The Rather was under contract with Shell to drill several oil wells in the Gulf of Mexico, as part of Shell's deepwater Europa project. At the time of the accident, Mr. Parfait and other crewmembers were working on two elevated platforms running sections of pipe, called the inner string, through a high-pressure wellhead that would later be lowered to the seabed.
The wellhead used on the Rather was a model SS-15, which was designed and manufactured by Dril-Quip, Inc. ("Dril-Quip"). Shell engineers selected Dril-Quip's SS-15 wellhead based on its particular attributes needed for the Europa wells, particularly the ability of the wellhead to combat an underground phenomenon known as "shallow water flow." To deploy the wellhead, it had to be placed in the rotary table, a large circular opening on the floor of the drilling rig. The wellhead was supported in the rotary table by a flat, steel plate, called a wellhead support plate, which was designed and manufactured by Dril-Quip and owned by Shell. With the SS-15 wellhead sitting on the support plate, the top of the wellhead extended about 5½ feet above the drill floor. The inner string of pipe was run through the wellhead until enough pipe hung below the wellhead to attach the wellhead and the inner string to the drill string, which was then lowered to the seabed. Each joint of the inner string run through the wellhead was attached to the preceding joint and then tightened with two sets of tongs, which were operated by the floor hands. The tongs consisted of two large wrenches approximately 4½ feet long that were suspended 6½ and 7½ feet above the drill floor by steel cables. The "lead tongs" were placed on the existing joint of pipe, which protruded about a foot or more above the top of the wellhead, while the "backup tongs" were placed on the bottom of the new joint of pipe to be attached and tightened. For optimal control, the floor hands had to grip the tongs somewhere between waist high and shoulder high. In order to do so, they had to stand on elevated work platforms while running the inner string, a process that took three to five hours to complete.
Transocean had fabricated the elevated work platforms that were used on the Rather. They were made of steel and had adjustable legs, allowing the floor hands to stand a maximum of 3 feet, 11¼ inches above the drill floor. The surface area of the platforms measured 3 feet wide by 5 feet, 1 inch long and was made of open metal grating with serrated teeth. At the time of the accident, Mr. Parfait and Mark Age, another floor hand, were standing on one elevated platform attempting to latch and tighten the lead tongs onto the drill pipe when Mr. Parfait fell from the platform, landing on the drill floor. As a result of the fall, Mr. Parfait fractured his right wrist and injured both knees. Following the accident, he underwent multiple surgeries for the wrist injury, as well as *470 arthroscopic surgery on each of his knees to repair a torn medial meniscus.

PROCEDURAL HISTORY
Mr. Parfait filed a suit for damages on August 12, 1999, under 46 U.S.C.App. § 688, commonly referred to as the Jones Act, and general maritime law pursuant to the "saving to suitors" clause in 28 U.S.C. 1333, naming Transocean and Shell as defendants. Referencing the restriction of La. C.C.P. art. 1732(6)[3], Mr. Parfait did not request a jury trial at that time. However, on September 5, 2000, he filed a jury request and bond, which the trial court denied as not in accord with La. C.C.P. art. 1733 C[4]. Subsequently, at a pretrial conference held on May 8, 2001, the trial court signed a jury trial order and set the matter for trial on January 8, 2002. Transocean and Shell filed a joint motion to strike the request for a jury trial and to vacate the jury order. Meanwhile, Mr. Parfait filed a motion to continue the trial, which the trial court granted. He then filed a third supplemental and amended petition, adding Dril-Quip as a defendant, and a second request for a jury trial and jury bond, which the trial court granted. Shell and Transocean again filed a joint motion to strike the request for a jury trial and motion to vacate the jury order.
On July 30, 2002, with leave of court and over the defendants' objections, Mr. Parfait filed a fourth supplemental and amending petition deleting the specific reference to La. C.C.P. art. 1732(6) in the second paragraph of his petition, but still maintaining his action as one under the Jones Act and general maritime law. Shortly thereafter, the trial court denied Shell and Transocean's joint motion to strike the jury request and motion to vacate the jury order.
The case proceeded to trial before the jury on January 20, 2004. At the close of the plaintiff's case, Shell and Dril-Quip moved for directed verdicts. The trial court granted a directed verdict in favor of Dril-Quip, dismissing it from the suit, but denied Shell's motion. Following the trial, the jury rendered a verdict in favor of the plaintiff finding Transocean 75% negligent under the Jones Act and Shell 25% negligent under general maritime law. The jury also found the Rather was not unseaworthy. In accord with the jury's verdict, the trial court rendered a judgment awarding Mr. Parfait damages of $125,035.00 in past lost wages; $300,000.00 in loss of future earning capacity; $5,994.11 in past medical expenses; $250,000.00 in future medical expenses; $20,000.00 in future lost benefits; and $1,000,000.00 in general damages for a total award of $1,701,029.11.[5] Transocean and Shell filed a joint motion for a new trial, or alternatively motion for remittitur on the issue of general damages awarded by the jury, and Shell filed a motion for a judgment notwithstanding the verdict (JNOV). The trial court denied the post trial motions. Transocean and Shell appealed. *471 Mr. Parfait neither appealed not answered the defendants' appeal.

ASSIGNMENTS OF ERROR
Transocean and Shell raise the following assignments of error on appeal.
1. The trial court erred in granting Mr. Parfait a jury trial.
2. The jury's finding of Jones Act negligence was not supported by the evidence and conflicts with its finding of no unseaworthiness.
3. The trial court erred by allowing the expert testimony of David Williams and Robert Borison.
4. The trial court erred in prohibiting the questioning of Mr. Parfait's expert witnesses on never having inspected the vessel.
5. The trial court erred in allowing evidence of other unrelated projects regarding the use of wellhead support plates.
6. The trial court erred in refusing to allow evidence of Mr. Parfait's previous disability, medical treatment, and claim for and award of lost future earning capacity resulting from his prior accident and lawsuit.
7. The jury's award of general damages was unreasonably excessive.
8. The trial court erred in not granting Shell's motion for a directed verdict or motion for the JNOV.

LAW AND DISCUSSION

Jury trial
In the first assignment of error, Transocean and Shell contend that the trial court erred in granting Mr. Parfait a jury trial. Specifically, they argue that even though Mr. Parfait initially designated his suit "as an admiralty claim brought pursuant to La. C.C.P. art. 1732(6)" and subsequently amended his petition to delete the La. C.C.P. art. 1732(6) designation, he was not entitled to a jury trial as his case remained one brought pursuant to the savings to suitors clause of 28 U.S.C. § 1333 and the Jones Act and general maritime law. Thus, the defendants contend that pursuant to La. C.C.P. art. 1732(6), as in effect at the time of the accident, Mr. Parfait was not entitled to a jury trial. The defendants further contend that Mr. Parfait's amended pleading requesting a jury trial was not timely under La. C.C.P. art. 1733C.
The right to a trial by jury is recognized in all cases, except as limited by article 1732 of the Louisiana Code of Civil Procedure. La. C.C.P. art. 1731(A). Before its amendment in 1999, La. C.C.P. art. 1732(6) stated that a trial by jury was not available in a suit on an admiralty or general maritime claim under federal law brought in state court under a federal saving to suitors clause, if the plaintiff designated that suit as an admiralty or general maritime claim.[6] Article 1732(6) was still in effect when Mr. Parfait's causes of action arose on April 23, 1999.
In Parker v. Rowan Companies, Inc., 599 So.2d 296 (La.1992) (on rehearing), cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992), the Louisiana Supreme Court examined the history of La. C.C.P. art. 1732(6) and concluded its purpose was to "track the federal system and give injured seamen who choose to file [Jones Act cases] in state court the same choice of jury or bench trial as they would have in federal court." Id. at 299. The Court recognized that La. C.C.P. art. *472 1732(6) is analogous to Rule 9(h) of the Federal Rules of Civil Procedure[7] and that the selection of a bench trial pursuant to Rule 9(h) "is not irrevocable; the petition may be amended to add or withdraw the election." Id. at 298. The Court specifically stated:
It is noteworthy that [Article 1732(6)] does not prescribe that [the] plaintiff must elect the option at the outset of the lawsuit. The counterpart federal procedure is quite liberal in terms of allowing a seaman to amend his petition to change his election (i.e., either to opt for a 9(h) bench trial or for the civil side with [a] jury trial). There is no reason why we should not interpret this Louisiana statute to facilitate plaintiff's choice by permitting him to modify or supplement his petition, as in Parker's case where he amended his pleading after first having sought a jury trial ..."
Id. at 302. The Court also concluded that the right to choose a bench trial or a jury trial was exclusive to the plaintiff and did not violate the due process rights of a defendant. Id. at 301.
Unlike the plaintiff in Parker, supra, who initially requested a jury trial, Mr. Parfait referenced the restriction of La. C.C.P. art. 1732(6) in his original petition and did not request a jury trial. However, like the plaintiff in Parker, Mr. Parfait was allowed to amend his petition, but, in his case, to delete the article 1732(6) designation to facilitate his right to a jury trial. Although Mr. Parfait's amended claim remained one under general admiralty law, it maintained his cause of action under the Jones Act. Thus, Mr. Parfait still had the right to opt for a jury trial.
The defendants contend that Mr. Parfait's request for a jury trial was untimely because it did not comply with the provisions of La. C.C.P. art. 1733C, which requires a pleading demanding a jury trial to be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a jury trial. They point out that because of the restriction of article 1732(6), there was never any issue in this case triable by a jury and, thus, Mr. Parfait's pleading to obtain a jury trial was not made within ten days after the service of a pleading directed to an issue triable by a jury. We find no merit to this argument.
In his original petition, Mr. Parfait alleged a claim of negligence under the Jones Act and thereby presented an "issue triable by a jury." The fact that he also referenced the article 1732(6) restriction in his petition meant only that he did not intend to exercise his right to a jury trial. Nevertheless, because that right was exclusive to him as the plaintiff, Mr. Parfait could amend his petition at anytime to opt for a jury trial as long as the defendants were not unduly prejudiced. Such is the result contemplated by the legislature in *473 1988 when it amended La. C.C.P. art. 1732 to give seamen filing Jones Act claims in state court the same choice of a judge or jury trial that prevails in federal court.
At the time Mr. Parfait's Jones Act and general maritime causes of action arose, the defendants never had the right to choose between a judge or jury trial, as that election belonged to the plaintiff alone. Furthermore, the defendants have not demonstrated that they were unduly prejudiced by the trial court's allowing Mr. Parfait to amend his petition to opt for a jury trial rather than a judge trial. The record reflects that the trial court granted the plaintiff leave to file his fourth supplemental and amending petition and request a jury trial on July 30, 2002, but the matter did not go to trial until January 2004. Under those circumstances, the defendant cannot complain that time was insufficient to prepare for a jury trial. Thus, we cannot say the trial court erred in allowing Mr. Parfait to amend his original petition to delete the La. C.C.P. art. 1732(6) designation and granting him a jury trial. See Parker v. Rowan Companies, Inc., supra, citing Forbes v. A & P Boat Rentals, Inc., 689 F.Supp. 625 (E.D.La.1988) where the court allowed the plaintiffs to amend their complaint at the beginning of trial to delete the Rule 9(h) designation to assert their right to a jury trial where the defendant was not prejudiced.

Standard of Review
In reviewing factual determinations made in Jones Act and general maritime cases, the manifest error standard of review is applied. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 12 (La.7/2/96), 676 So.2d 89, 96. The factfinder's factual determinations may not be disturbed on appeal unless they are clearly wrong. Stated another way, in order to reverse a factual determination, an appellate court must find: (1) a reasonable factual basis does not exist in the record for the finding; and (2) the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).

Jones Act Negligence
The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C.App. § 688. The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. See id. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the owner's duty of care. 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335-336 (5th Cir. 1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. A seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. Id. at 334-35. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. Id. at 339; Foster v. Destin Trading Corp., 96-0803, pp. 6-7 (La.5/30/97), 700 So.2d 199, 208 (on *474 reh'g). The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. Gautreaux, 107 F.3d at 339.
With respect to seaworthiness, an owner of a vessel has an absolute duty to furnish a seaworthy vessel, and a breach of that duty gives rise to a claim for general damages. To state a cause of action for unseaworthiness, the plaintiff must allege an injury "caused by a defective condition of the ship, its equipment or appurtenances.... Members of the crew of a vessel are also warranted as seaworthy...." 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-25, at 333-34 (2d Ed.1994). The test for determining seaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use. Foster, 96-0803 at p. 6, 700 So.2d at 209.
Jones Act negligence and unseaworthiness are two separate and distinct claims, Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971), requiring two different standards of proof. The Jones Act requires only that there be some evidence of negligence, however slight, which caused the plaintiff's injuries. Gautreaux v. Scurlock Marine, Inc., supra. On the other hand, in order to prove a claim of unseaworthiness, a plaintiff must show that the unseaworthy condition of the vessel was the proximate or direct and substantial cause of the seaman's injuries. See Alverez v. J. Ray McDermott & Co., Inc., 674 F.2d 1037, 1042 (5th Cir.1982). Although negligence and unseaworthiness are totally separate concepts, the same factual basis has been used to assert both theories of recovery. See Brunner v. Maritime Overseas Corporation, 779 F.2d 296, 298 (5th Cir.1986), cert. denied, 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986).
In this case, the finding that the Rather was seaworthy meant the jury concluded the evidence supported the defendants' claims that the platforms were reasonably fit for their intended purpose. Mr. Parfait neither appealed that part of the jury verdict nor answered the defendants' appeal. Transocean contends that in view of the jury's finding the Rather was seaworthy, no other basis existed upon which the jury could have found it negligent. It argues that the jury's findings that it was negligent and the vessel was not unseaworthy are inconsistent and irreconcilable because both claims arise from the same alleged unsafe condition, the elevated platform.
To the contrary, Mr. Parfait argues that the evidence was sufficient for the jury to have found Transocean negligent for reasons other than the condition of the work platform. Specifically, he argues that Transocean was negligent in not recommending to Shell that it use an alternative method for installing the high-pressure wellhead, i.e., a method that did not require the floor hand to stand on an elevated platform. He also contends that Transocean was negligent for not complying with its own safety standards that called for eliminating the fall hazard by installing handrails on the platforms or requiring the floor hand to wear a safety harness. Alternatively, Mr. Parfait argues Transocean was negligent in failing to construct a more "purpose built" platform.
Notwithstanding the jury's finding that the vessel was seaworthy, we agree with the plaintiff that the jury could have found Transocean negligent, as liability based upon seaworthiness is wholly distinct from *475 liability based upon negligence. The more liberal causation standard under the Jones Act required the plaintiff to offer only slight evidence that Transocean's negligence contributed to his injury. The jury's verdict does not include a special interrogatory from which we can determine the basis for its finding Transocean negligent. Nonetheless, in reviewing the record, we find a reasonable basis exists upon which the jury could have found Transocean negligent based on its failure to minimize the fall hazard by not installing a handrail on the elevated platform.
Mr. Parfait testified that he had been employed on the Rather since 1996 and had worked with the Transocean crew installing the wellheads on two of Shell's three other Europa wells, but he had never worked on the elevated platform prior to the accident. He testified that at the time of the accident he and Mark Age were standing on one platform operating the lead tongs while Curt Thwaites, another floor hand, stood on the other platform working the bottom tongs. As to the accident, he initially testified that he did not remember which part of the two-step process he was performing when he fell to the drill floor, stating, "I just  before I knew it I was just on the floor on all fours and I was  I just fell, that's it." Upon further examination, however, he testified that he and Mr. Age were trying to get the tong to bite when he fell.
After the accident Thom Preston, the emergency medical technician on the Rather, treated Mr. Parfait. Mr. Preston testified by deposition that in conjunction with the treatment he was required to complete Transocean's "Report on the Job Injury/Illness" form. He stated that in the section for the employee's description of the illness or injury, Mr. Parfait gave him the following explanation "I was making a bottom hole assembly, pulled the tongs back while running the inner string and I slipped off [the] stand, [the] four foot stand."
Tom Johannsen, the Rather's Rig Safety Technical Coordinator ("RSTC") conducted an accident investigation for Transocean. The plaintiff introduced into evidence Transocean's Incident Investigation Report prepared by Mr. Johannsen. The report read, in part:
"[Mr. Parfait] stated that he was pulling back on one set of tongs with one foot on the grating and one foot on the C-Plate, sitting on top of the wellhead, to use as leverage. He said his foot slipped and he fell backward to the rig floor, putting his right hand out to break his fall."
Robert Borison testified for the plaintiff as an expert in safety relative to oil and gas exploration and production operations. Mr. Borison testified that regardless of what caused Mr. Parfait to slip, it was the fall from the platform that caused the fracturing of his wrist. According to him, Transocean could have taken several steps to eliminate or minimize the fall hazard posed by the elevated platform, but failed to do so. Initially, Transocean could have insisted that Shell utilize a wellhead that used a recessed support plate or "bucket," enabling the wellhead to rest in the rotary table on the drill floor rather than above it. A recessed support plate would have allowed the floor hands to operate the tongs standing on the drill floor rather than on elevated platforms.
Mr. Borison opined, however, that if Transocean had to run the inner string from the elevated platforms because a recessed support plate was unavailable, then it should have installed handrails on the platforms. He noted that Transocean's own safety policy and procedure manual called for using a fall protection system, e.g., handrails or a fall arrest system, *476 where a fall hazard existed. He emphasized, too, that the Occupational Safety and Health Administration ("OSHA") standards required handrails on any platform raised four or more feet off the ground and the Transocean platform measured just ¾ of an inch less than four feet. In his opinion, a handrail on the platform would have prevented Mr. Parfait's fall.
Mr. Parfait also offered the testimony of Robert Batson, Shell's drilling foreman on the Rather who had conducted a post-accident investigation for Shell. In completing Shell's "Report of Occupational Injury or Illness" under the category "Unsafe Conditions," Mr. Batson checked "Workplace hazard" as a primary cause of the accident. Notably, the defendants offered the testimony of several witnesses, including Mr. Parfait's co-workers, who claimed that a handrail would have posed a significant danger to the floor hand because it would have created a "pinch point," i.e., the floor hand could easily get caught between the tongs and the handrail, as well as hindered an escape from the platform in the event of fire or well blowout. However, both Mr. Parfait and the defendants introduced into evidence numerous photographs depicting the platform, the rig floor and drilling equipment from which the jury could have determined that a handrail would have minimized the fall yet also allowed the floor hand to work safely.
As previously mentioned, Mr. Parfait alleged two separate, distinct theories of recovery, unseaworthiness of the vessel under general maritime law and Jones Act negligence. As the fact finder, the jury had the power to determine what facts constituted unseaworthiness as well as what facts constituted negligence. See Brunner v. Maritime Overseas Corporation, 779 F.2d 296 (5th Cir.1986), cert. denied, 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986). The jury's answers to the unseaworthiness and negligence interrogatories are not irreconcilable. As the vessel owner, Transocean's duty to furnish a seaworthy vessel was absolute and completely independent of its duty as an employer under the Jones Act. As a Jones Act employer, Transocean's duty to Mr. Parfait was that of ordinary prudence, that is, the duty to take reasonable care under the circumstances. The jury could have concluded from the evidence that Transocean failed to exercise reasonable care by having Mr. Parfait work on an elevated platform without railings, but that the platform did not make the vessel unseaworthy, i.e., the platform did not render the Rather unfit for drilling wells in the Gulf of Mexico. Based on the photographs and Mr. Borison's testimony that Transocean failed to comply with its own safety policy to minimize any fall hazard and could have done so by installing a handrail on the platform, we find the jury could have concluded that Transocean breached its duty of care to Mr. Parfait by not exercising reasonable care under the circumstances. Thus, we cannot say the jury was clearly wrong in determining that Transocean's negligence contributed to Mr. Parfait's injuries.

Shell's Negligence
Mr. Parfait sued Shell under general maritime law. He maintains, as he did at trial, that Shell was negligent for using a wellhead support plate that was unreasonably dangerous.
Mr. Parfait's claim against Dril-Quip for manufacturing and selling allegedly defective and unreasonably dangerous equipment was dismissed by a directed verdict at the close of his case, and he did not appeal from that judgment. Thus, the trial court's determination that Dril-Quip's SS-15 wellhead and flat support plate were not defective or unreasonably dangerous *477 is final. In view of the directed verdict in favor of Dril-Quip, Shell cannot be negligent for using Dril-Quip's wellhead and flat support plate.
Mr. Parfait further claims that Shell was negligent for not requesting Dril  Quip to design and manufacture a recessed support plate for the Europa project, when the technology was available to do so. In support of his claim, Mr. Parfait offered evidence that on an earlier project, Shell's Ursa project, Shell and Transocean had used a wellhead manufactured by the company, Vetco. Vetco had provided a "clamp" to use with its wellhead that, when installed, allowed the wellhead to sit low in the rotary table, enabling the floor hands to work on the drill floor rather than from platforms. Knowing that this safer alternative was available at the inception of the Europa project, Mr. Parfait contends Shell had a duty to either use the other wellhead or to have had Dril-Quip fabricate a recessed support for the SS-15 wellhead. We disagree.
As previously mentioned, the SS-15 wellhead and flat support plate were not unreasonably dangerous. Mr. Waitus Denham, Shell's drilling engineer who drafted the well prognosis[8] for the Europa project, testified that he selected Dril-Quip's SS-15 wellhead for the project based on its distinct ability to combat the shallow water flow problem and, at the time, the flat wellhead support plate, which was manufactured in 1990, was the only support plate that had ever been used with the SS-15 wellhead. Also, it is undisputed that Shell had no control over Dril-Quip's design and manufacturing operations. Thus, we find no merit to this argument.
Finally, Mr. Parfait maintains that Shell should have ceased drilling on the Europa project until Dril-Quip manufactured a recessed support plate for the SS-15 wellhead. He offered evidence that indicated that while the Europa project was ongoing, Shell began planning the Shell Boris project and, in connection therewith, Dril-Quip set out to design and manufacture a recessed support plate to use with the SS-15 wellhead. Knowing that, Shell should have stopped drilling on the Europa wells until the recessed support plate was available to use, he contends.
We find no merit to this argument for the same reason. Dril-Quip's SS-15 wellhead and flat support were not unreasonably dangerous. Shell had drilled three of the four Europa wells using the flat support plate without any problem, the third being completed the day before Mr. Parfait's accident. Under these circumstances, Shell had no reason to foresee that an accident might occur, which would have imposed a duty on it to Mr. Parfait to cease operations until a recessed support plate could be used.
Thus, considering the evidence in the record, we find the jury was clearly wrong in finding Shell negligent and the judgment against it must be reversed.

Admissibility of Expert Testimony
In the third assignment of error, Transocean argues that the trial court erred by allowing the expert testimony of both Mr. Borison and David Williams, the plaintiff's expert in the planning and execution of deep water well drilling programs. As to Mr. Borison, Transocean argues that he was not qualified to render the opinions he expressed at trial because he lacked the specialized training, education or technical *478 experience upon which to base his opinions. Regarding Mr. Williams, Transocean acknowledges that he was qualified to express opinions on the technical aspects involved in developing a well drilling plan. However, it challenges the admissibility of his testimony with respect to Transocean's duty of care because he lacked any reliable methodology to support his opinion. In other words, Mr. Williams' opinion as to Transocean's duty was just that, his opinion.
Louisiana Code of Evidence art. 702, which is patterned after Federal R. Evid. 702, provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
As recognized by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Fed. R.Evid. 702 was intended to liberalize and make less restrictive the admissibility of expert testimony. The trial court has great discretion in deciding which witnesses are qualified as experts, and the breadth and scope of expert testimony. La. C.E. art. 702 Comment (d); Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315 (La.App. 4th Cir.1993); see also State v. Foret, 628 So.2d 1116 (La.1993).
The record reflects that the parties had questioned Mr. Borison and Mr. Williams extensively on their education, training, and experience in their respective areas of expertise. Although Mr. Borison was not a certified safety professional, he had eighteen (18) years experience as a safety consultant in the oil and gas industry and with the United States Department of Energy. During the course of his career, Mr. Borison inspected numerous platforms, scaffolding, steps, ladders and grating on inshore and offshore drilling rigs for several major oil companies, including Chevron, Shell and Texaco, for safety violations. He was familiar with the OSHA and Coast Guard regulations and the American Petroleum Institute ("API") standards and made recommendations when needed. Mr. Williams was a licensed petroleum engineer with many years experience as a drilling engineer. He also had a degree in mechanical engineering. Prior to forming his own consulting firm, he worked for Exxon and several smaller oil production and pipeline companies. In addition to well planning, Mr. Williams previously had testified in both state and federal courts as an expert in drilling operations.
Based on the evidence presented, we cannot say the trial court abused her much discretion or erred in allowing Mr. Borison and Mr. Williams to testify as experts in their respective fields. Furthermore, in view of Mr. Williams' extensive experience in developing deepwater well plans, we find his testimony relative to Transocean's duty as a drilling contractor in the well planning stage was properly admitted. It was for the jury to determine whether Mr. Williams' testimony was reliable and worthy of any weight.
Thus, we find no merit to the third assignment of error.

Limiting Cross-examination of Mr. Parfait's Experts
Transocean argues in the fourth assignment of error that the trial court erred in prohibiting the defendants from cross-examining the plaintiff's experts regarding *479 their failure to inspect the drilling rig.[9]
Prior to trial, plaintiff's counsel filed a motion in limine asking the trial court to prohibit the defense attorneys from cross-examining the plaintiff's experts regarding their failure to inspect the Rather. Mr. Parfait claimed that during discovery his counsel inquired about inspecting the drilling rig, but was informed that the Rather had been moved to a location off the coast of Africa. He claimed that Transocean and Shell had their experts inspect the rig prior to the move without informing his attorneys or providing his experts the opportunity to inspect the rig. The trial court, over the defendants' objections, granted the motion and limited the cross-examination of the plaintiff's witnesses.
The record, however, indicates that it was the plaintiff's fault that his experts failed to inspect the rig. Initially, the plaintiff contacted Transocean and Shell, requesting that the Rather be made available for inspection, and the defendants complied. The date was selected and all parties were scheduled to attend an inspection of the rig on January 18, 2001. A few days before, plaintiff's counsel cancelled the inspection. Transocean's attorney sent a letter to Mr. Parfait's attorney dated January 15, 2001, verifying that the plaintiff had cancelled the inspection. The letter also requested that the plaintiff provide the defense with available dates for rescheduling the inspection. Plaintiff's counsel never responded. Although the Rather remained in the Gulf of Mexico for two more years, until late January 2003, when it departed for the African coast, plaintiff's counsel made no attempt to contact the defendants to reschedule the inspection. Under those circumstances, we find the trial court erred in granting the plaintiff's motion in limine.
Nonetheless, we cannot say the trial court's prohibiting defense counsel from cross examining Mr. Borison about his failure to inspect the Rather amounts to reversible error. Mr. Borison acknowledged at trial that he was unfamiliar with the drilling rig, the location of the equipment on the rig, and the equipment used in the drilling operation. From his testimony, the jury certainly could have concluded that Mr. Borison had never inspected the Rather. Thus, we find the granting of the plaintiff's motion in limine was at most harmless error.

Evidence of other Drilling Projects
In the fifth assignment of error, the defendants argue that the trial court erred in allowing the plaintiff to introduce at trial, over their objection, evidence of other drilling projects in which Shell and/or Transocean used a wellhead that utilized a "bucket," "clamp" or recessed support plate which allowed the floor hands to operate the tongs from the drill floor. These drilling projects included Shell's Ursa and Boris projects and the Amoco King project. The defendants argue that the evidence was irrelevant, as those projects had nothing to do with the accident at issue, and was prejudicial and confused the jury.
Louisiana Code of Evidence art. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code of Evid. art. 403 provides, "[a]lthough relevant, evidence may be excluded *480 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or waste of time." The trial court's rulings on such evidentiary issues as the relevance of evidence and whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect will not be disturbed unless a clear abuse of discretion is shown. Jones v. Peyton Place, Inc., 95-0574, pp. 11-12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763.
In this case, Mr. Parfait alleged that Transocean and Shell had prior knowledge of a safer method to install a high-pressure wellhead than the one used in drilling the Europa project wells and also that the technology was available to them to develop a recessed support plate for the SS-15 wellhead. We find the evidence of the other drilling projects was relevant in that it showed the jury that prior to drilling the Europa wells the defendants had used or developed equipment that placed the wellhead into the rotary table rather than above it so as to allow the floor hands to work from the drill floor and, as such, the fall hazard associated with working from the elevated platform could have been eliminated. Moreover, we find the probative value of this evidence was not substantially outweighed by concerns of unfair prejudice or the possibility that the jury would be confused or mislead. Thus, we find no reversible error in the trial court's ruling allowing Mr. Parfait to present evidence of the other deepwater well drilling projects to the jury.

Evidence of Mr. Parfait's Previous Accident, Injury and Lawsuit
In 1988, Mr. Parfait lost two fingers on his left hand in a work related accident while employed by Dupre Brothers Construction Company, Inc. He filed a suit for damages, obtained a favorable judgment following a judge trial, and eventually settled the case. Transocean sought to introduce evidence relating to Mr. Parfait's earlier accident, including his mental and physical injuries, the disability assessment, and the award for loss of future earning capacity. It also sought to cross-examine Mr. Parfait's expert witnesses, who had testified for him in the previous trial, on those issues. Mr. Parfait filed a motion to exclude the evidence, which the trial court granted. The defendants then proffered the evidence.
The proffered evidence included the judgment, the trial judge's reasons for judgment, and the settlement release from Mr. Parfait's earlier suit, as well as deposition testimony from Dr. Robert Ancira and Dr. William Kinnard, medical records from Dr. Marsha Redden, excerpts from Mr. Parfait's trial testimony, and reports from Dr. G. Randolph Rice and Dr. Kenneth J. Boudreaux, the parties' economic experts. In the prior case, the trial judge noted that Mr. Parfait had suffered severe depression and that his life was devastated as a result of the accident. He specifically found Mr. Parfait was "totally disabled" from both the physical and psychological injuries he had sustained and awarded him a total of $1,648,963.00, including $376,293.00 for future lost wages. While an appeal of the judgment was pending, the parties settled the case for $995,050.00. The excerpts from psychiatrist Dr. Ancira's deposition indicated that he treated Mr. Parfait for acute depression associated with his 1988 injury and the death of his wife in October of that year. The medical records from clinical psychologist Dr. Redden corroborate Dr. Ancira's testimony that Mr. Parfait suffered from severe depression as a result of the earlier accident and Mrs. Parfait's death.
*481 In Ronquillo v. Belle Chase Marine Transportation, Inc., 629 So.2d 1359, 1362 (La.App. 4 Cir.1993), quoting from the case of Ewell v. Schwegmann Giant Super Markets, 499 So.2d 1192, 1195 (La.App. 5 Cir.1986), we held that "[E]vidence of prior injury and claims is admissible insofar as they bear upon any issue before the court, including credibility, and to establish whether the disability is causally related to the particular accident." Ronquillo, supra, involved a plaintiff who injured his back in a slip and fall accident offshore. The plaintiff alleged that he suffered major depression as a result of his surgeries and his subsequent inability to serve as a boat captain, and would need future psychiatric treatment. The trial court, over the plaintiff's objection, allowed the defense to present medical testimony regarding the plaintiff's psychiatric treatment four years prior to the vessel accident. The plaintiff's psychiatrist testified that the plaintiff had reported that he was suffering from a range of anxieties and had suffered from depression throughout his life. On appeal, we concluded that this testimony was proper and relevant, as the jury could have believed that the depression was a longtime illness.
In Page v. Guidry, 506 So.2d 854, 857 (La.App. 1st Cir.1987), the First Circuit Court of Appeal found no error in the district court's admission into evidence of the settlement agreements from the plaintiff's two prior accidents. The court noted that the agreements were admissible to show that the medical expenses claimed by the plaintiff had already been submitted for recovery in the prior settlements. The court also found that the plaintiff's veracity and credibility were questioned by the fact that he had submitted the same medical bills in both settlements and was seeking recovery for the costs for a third time.
Mr. Parfait alleged and testified at trial that he suffers from severe depression and can no longer work as a result of his fall from the elevated platform. Thus, he placed at issue the cause and extent of his current psychological and physical injuries. Also, Dr. Rice testified at the present trial that Mr. Parfait's total loss of earning capacity was based on the assumption that he was totally and permanently disabled. However, according to the proffered evidence, in the prior case Dr. Rice made the same determination based on the same assumption, yet Mr. Parfait eventually returned to work. Transocean should have been allowed to question Dr. Rice on this issue and argue to the jury for a reduction of any claim for loss of future earning capacity because Mr. Parfait already had received damages based on a total and permanent disability unrelated to the present accident and to recover again would have amounted to a double recovery.
To the extent the trial court excluded the evidence of Mr. Parfait's prior accident and disability assessment as well as prior damages based on his apparent total and permanent disability, she clearly abused her discretion and erred in doing so. The evidence was certainly relevant to Mr. Parfait's credibility and raises questions regarding the speculative nature of the damages for future loss of earning capacity. Thus, we find the trial court's error in excluding the proffered evidence was not harmless.
A court of appeal may not set aside a jury's finding of fact in the absence of error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and *482 determine a preponderance of the evidence. Evans v. Lungrin, 97-0541, 97-0577, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Id. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Id.
In view of our finding that the trial court's error in excluding the proffered evidence affected the jury's verdict with respect to Mr. Parfait's physical and psychological damages, we must vacate the jury's verdict on damages and conduct a de novo review of the record.

Damages
The record discloses that at the time of the accident Mr. Parfait was 46 years old, in good physical condition and, despite his left hand disability, did nearly every job required of a floor hand. By all accounts, he was an exemplary employee and soon would have been promoted to a derrick man position if not for the accident. As a result of the fall, Mr. Parfait fractured his right wrist and tore the medial meniscus in each of his knees. He was transported by helicopter from the rig to St. Tammany Parish General Hospital, where Dr. John Logan, an orthopedic surgeon, set the fracture and applied an external fixator device to the arm. The following morning Mr. Parfait was transported back to the rig where he remained for ten days until his 14-day hitch ended. After being home several days, he developed an infection in his wrist and had to be readmitted to the hospital on May 11, 1999. Dr. Logan removed the cast and external fixator and performed a debridement to remove the infected tissue. Mr. Parfait remained in the hospital for several days, receiving intravenous antibiotics. He returned to the hospital again on May 19, 1999, and underwent a third surgery on the wrist to further treat the infection.
Mr. Parfait subsequently transferred his follow-up care to Dr. William Kinnard, an orthopedic surgeon closer to his home in Terrebonne Parish. In July 1999, he returned to Dr. Kinnard complaining of severe pain in his right wrist and arm. At that time, Mr. Parfait underwent a nerve conduction study and an electromyogram ("EMG")[10]. Shortly thereafter, Dr. Kinnard again operated on his right wrist and arm to release three nerve impingements.
In August 1999, Mr. Parfait underwent arthroscopic surgery to his left knee to repair the torn medial meniscus. Four weeks later, Dr. Kinnard performed the same procedure on his right knee. Thereafter, Mr. Parfait underwent extensive physical therapy for his knees.
Mr. Parfait continued to have pain in his right wrist following his July 1999 surgery, and Dr. Kinnard ordered a second EMG and nerve conduction study, which was performed on March 9, 2000. Dr. Kinnard also had Mr. Parfait undergo radiographic studies on his right wrist. The diagnostic tests disclosed that the fractured bone in Mr. Parfait's right wrist had not healed properly. Dr. Kinnard opined that the bone failed to heal because the external fixator had to be removed prematurely when Mr. Parfait developed the infection. As a result, Dr. Kinnard performed a fifth surgery on the wrist on October 30, 2000. Despite the surgeries, Mr. Parfait continued to have pain in his wrist and both knees and was referred to a pain management specialist for trigger point injections.
*483 Although the trigger point injections provided Mr. Parfait some relief, Dr. Kinnard opined that he would continue to suffer some pain and discomfort for the rest of his life. He further opined that because of the injuries and resulting permanent physical impairments, Mr. Parfait will be limited to sedentary activities in the future and will have to take various pain and anti-inflammatory medications. Dr. Kinnard assigned 30% impairment to Mr. Parfait's right wrist and arm and a 10% impairment to each of his knees. As a result of his injuries, Mr. Parfait testified that he has problems using a screwdriver, walking long distances, squatting and lifting. In addition to not being able to work, he testified that he can no longer hunt, fish or bowl, which are his favorite activities.
As to his psychological injuries, Dr. Ancira testified that he treated Mr. Parfait for depression, anxiety disorder and insomnia as a result of his injuries from the fall. He prescribed the drug Celexa for Mr. Parfait's depression, Clonopin and Valium for his anxiety, Ambien for the insomnia, and Provigil to improve his attention. Dr. Ancira opined that Mr. Parfait would have to take the medications for the foreseeable future, yet as his symptoms improved, the drugs might gradually be reduced and possibly eliminated.
Dr. Rice, Mr. Parfait's expert economist, testified that Mr. Parfait had a future work life expectancy of 10.21 years and future life expectancy of 26.97 years. He estimated that based on the accident rendering Mr. Parfait totally and permanently disabled, his past loss of wages as a floor hand were $147,345.00, based on his 1998 income of $40,308.89. If Mr. Parfait were to have been promoted to a derrick man position shortly after the accident, earning $42,000.00 per year, then his past lost wages would have been $150,710.00. Dr. Rice estimated Mr. Parfait's future wage loss as ranging between $305,911.00 and $396,730.00, based on whether he would have been promoted to derrick man and then to assistant driller by the age of 52. He estimated Mr. Parfait's future loss of benefits, including medical, dental, life, accidental death and dismemberment insurance, at $38,409.00. Last, Dr. Rice calculated Mr. Parfait's future medical expenses to be $477,330.00; the estimate was based on Mr. Parfait's continuing his present medications and doctor visits for his future life expectancy with no reductions over time.
The defendants' expert economist, Dr. Boudreaux, testified that Mr. Parfait had a future work life expectancy of 9.8 years. He estimated his past loss of wages at $140,544.16 based on an annual income of $35,938.24, which was Mr. Parfait's average income for the three years preceding the accident. Dr. Rice testified that in the event Mr. Parfait never returned to work due to a permanent total disability his future loss of wages would be $260,000.00 and loss of fringe benefits would be $31,200.00. The defendant's also proffered a report prepared by Dr. Boudreaux for trial that stated Mr. Parfait had no future loss of wages as a result of his fall on the Transocean rig if you considered his award of $376,293.00 for future loss of wages in his prior suit and the fact that he returned to work in 1996.
After considering the evidence in the record, including the proffered evidence, we find Mr. Parfait is totally and permanently physically disabled as a result of his accident. We find that Mr. Parfait suffered from acute depression for several years prior to his fall on the rig and that the accident aggravated this pre-existing mental condition. As a result of his injuries, Mr. Parfait will need physical and psychological care to some degree for the foreseeable future. Nonetheless, despite *484 the physical and emotional constraints, we find Mr. Parfait is able to perform the daily activities of life, including dressing, bathing and feeding himself, cooking, cleaning and driving a vehicle. He has been able to maintain a relationship with his fiancée and actively participate in the lives of his three children. We are aware that Mr. Parfait recovered a substantial amount for future loss of wages as a result of his accident in 1988, and to award the amount of $305,000.00, as suggested by Dr. Rice, would effectively allow Mr. Parfait to recover twice for future lost wages. However, Mr. Parfait's future loss of wages from the 1988 accident were based on his 1987 annual income or $24,940.35, which is substantially lower than the $40,308.89 he had made in 1998, the year preceding his accident on the rig. With these factors in mind, we award Mr. Parfait the following damages:

Past Wage Loss[11] $125,035.00
Future Wage Loss, including loss of
earning capacity $150,000.00
Future Loss of Benefits $ 32,000.00
Past Medical Expenses[12] $ 5,994.11
Future Medical Expenses $100,000.00
General Damages[13] $300,000.00
 ___________
TOTAL $712,029.11

CONCLUSION
Accordingly, for the reasons stated herein, we reverse the judgment of the trial court in favor of Mr. Parfait, in part, to dismiss his claims against Shell and to vacate the damage award. We amend the judgment to cast Transocean 100% at fault[14] and award Mr. Parfait total damages of $712,029.11. As amended, the judgment is affirmed.
REVERSED IN PART, AMENDED IN PART AND, AS AMENDED, AFFIRMED.
ARMSTRONG, C.J., concurs in part and dissents in part.
JONES, J., concurs in part and dissents in part.
MURRAY, J., concurs in part and dissents in part.
McKAY, J., concurs in part and dissents in part for the reasons assigned by Judge LOVE.
BAGNERIS, J., concurs in part and dissents in part.
KIRBY, J., concurs in part and dissents in part for the reasons assigned by J. TOBIAS.
LOVE, J., concurs in part and dissents in part.
TOBIAS, J., concurs in part and dissents in part.
GORBATY, J., concurs in part and dissents in part.
LOMBARD, J., concurs in part and dissents in part for the reasons assigned by Judge BELSOME.
BELSOME, J., concurs in part and dissents in part.
ARMSTRONG, C.J., concurs in part and dissents in part.
I respectfully concur with the majority that the plaintiff properly was granted a jury trial, that there is no evidence that Shell Oil Products Co. was negligent, and *485 that the trial court's rulings with respect to the expert testimony of David Williams and Robert Borison, the questioning of these experts, and the evidence of other Shell projects were correct.
I agree with Judge Belsome that the trial court acted within its discretion in excluding of evidence of Mr. Parfait's prior injuries, and believe that the probative value of this evidence is exceeded by its likely prejudicial effect.
I find that the record, considered in its entirety, supports the jury's finding of Jones Act negligence on the part of Transocean Offshore, Inc.
I find adequate evidence in the record, considered in its entirety, to affirm the jury's damage award.
JONES, J., concurs in part and dissents in part.
While I agree that the district court erred in denying the request to question the petitioner or his expert relating to the residual effects of the petitioner's prior accident and resulting disability, I would vacate the judgment of the district court, conduct a de novo review of the record, and, having done so, affirm the judgment of the district court. Further, I agree with the majority that the judgment against Shell Oil should be reversed. In all other respects, as these reasons are contrary to that of the majority, I respectfully dissent.
MURRAY, J. concurs in part and dissents in part.
I concur in the majority's affirmation of Mr. Parfait's entitlement to a jury trial and its reversal of the judgment as to Shell. I, likewise, concur in the majority's determination that the trial court did not abuse its vast discretion in limiting the cross-examination of Mr. Parfait's experts or by allowing the introduction of evidence of other drilling projects. I also concur in the affirmation of the jury's finding that Transocean was negligent and that its negligence caused injury to Mr. Parfait.
I, however, cannot agree that the trial court abused its discretion in excluding evidence of Mr. Parfait's previous injury as its determination that the negligible probative value of such evidence was outweighed by its prejudicial impact, under the record circumstances, was reasonable. Nor can I agree that the exclusion of this evidence, if it was error, warrants de novo review.
Finally, I disagree with any reduction of the damages award to Mr. Parfait. The record as a whole supports the damages as found by the jury for this injury to this particular plaintiff, and I would affirm the damage award.
McKAY, J., concurs in part and dissents in part for the reasons assigned by Judge LOVE.
BAGNERIS, J., concurs in part and dissents in part.
I respectfully concur with the majority that the plaintiff was properly granted a jury trial; that there is no evidence that Shell Oil Products Co. was negligent; and that the trial court's ruling with respect to the admissibility of expert testimony, the limitation of cross-examination of Mr. Parfait's experts, and the evidence of other drilling projects was correct.
I concur with plurality as to the application of a de novo review.
However, I respectfully dissent from the quantum reduction to $712,029.11, as I would affirm the jury award in its entirety.
KIRBY, J.concurs in part and dissents in part for the reasons assigned by J. TOBIAS.
LOVE, J., concurs in part and dissents in part.
I respectfully concur with the majority's decisions on the issues regarding a *486 jury trial; Transocean's negligence; Shell's negligence; the admissibility of expert testimony; the limitation of cross-examination of Mr. Parfait's experts; the evidence of other drilling projects; and evidence of Mr. Parfait's previous accident, injury, and lawsuit. I concur with plurality as to the application of de novo review.
However, I respectfully dissent from the quantum reduction to $712,029.11.
I would affirm the $250,000 for future medical expenses that the jury awarded. Mr. Parfait received different physical injuries in this accident. Irrespective of his mental health allegedly resolving prior to the second accident, no preexisting physical injuries were aggravated and the testimony documented his need for varying future medical services. The testimony documented that Mr. Parfait will suffer from pain and discomfort for the remainder of his life even with the assistance of trigger point injections.
I find a general damages award of $750,000. Mr. Parfait suffered extensive physical injuries from this accident, which required multiple surgeries. It is apparent that Mr. Parfait was missing two fingers on his left hand and that the loss of the digits was not related to the accident in the case sub judice. The testimony showed that Mr. Parfait has 30% impairment in his right wrist/arm and 10% impairment in each of his knees. These injuries and physical impairments are unrelated to the first accident.
Therefore, given the evidence regarding Mr. Parfait's first accident, I would award the following damages:

Past Wage Loss $ 125,035.00
Future Wage Loss $ 150,000.00
Future Loss of Benefits $ 32,000.00
Past Medical Expenses $ 5,994.11
Future Medical Expenses $ 250,000.00
General Damages $ 750,000.00
_________________________ _____________
TOTAL $1,312,979.11

TOBIAS, J., concurs in part and dissents in part.
I respectfully concur in the majority's holding that the trial court did not err in granting the plaintiff a jury trial.[1] I further respectfully concur in the majority's opinion in affirming the jury's determination that the vessel was seaworthy and the absolving of Shell of liability. I note with particularity that Mr. Parfait did not appeal the jury's finding that the vessel TRANSOCEAN RATHER was seaworthy.
I respectfully dissent from the majority's decision to embrace the jury's finding that Transocean was negligent and the transfer of all liability for damages to them, thereby finding that Mr. Parfait is entitled to recover damages. The jury's finding of negligence is clearly wrong. No evidence in the record on appeal supports a finding of negligence on the part of Transocean once the jury found that the vessel was seaworthy. An expert speculates that a railing (handrail) installed around the elevated platform might have prevented Mr. Parfait from falling to the drill deck. The absence of a railing on the elevated platform from which Mr. Parfait fell and was injured is so integrally tied to the issue of seaworthiness that one cannot legitimately say any independent negligence *487 of Transocean played a part in Mr. Parfait's injuries. A vessel owner has an absolute duty to, furnish a seaworthy vessel and the test for determining seaworthiness is one of reasonable fitness. Foster v. Destin Trading Corp., 96-0803, p. 5 (La.5/30/97), 700 So.2d 199, 209. The vessel, its equipment and appurtenances need not be perfect, only reasonably fit for its intended use. Id., at p. 6, 700 So.2d 199. "A ship's equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party." Id. at p. 6, 700 So.2d 199, citing 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 6-25, at 333-34 [Emphasis supplied.].
A finding by the jury of seaworthiness in the case at bar satisfies the legal requirement that the vessel was reasonably fit for its intended use.
The majority cites Brunner v. Maritime Overseas Corp., 779 F.2d 296 (5th Cir. 1986) to support its position that a ship can be seaworthy yet the ship owner negligent. I find the majority incorrectly reads Brunner. Brunner demonstrates a situation where the vessel was seaworthy; but because someone spilled oil on the deck (in which Mr. Brunner slipped and fell), the vessel owner was negligent. Further, the majority cites Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997), which like Brunner presents a factually different case than the case at bar. Mr. Gautreaux alleged that his employer, the defendant, failed to properly train him in the use and operation of an electric towing winch and its manual crank handle, thereby not providing him a safe place to work. He thus asserted his employer was negligent. In overruling and questioning a long line of jurisprudence, the court held and the case stands for the proposition that "the standard of care to be attributed to either an employer or an employee [in a Jones Act case of negligence] is [not] anything different than ordinary prudence under the circumstances."
The case at bar presents an entirely different situation. A handrail installed around the elevated platform might have prevented Mr. Parfait from falling; but that railing would have been affixed to a part of the vessel, i.e., the elevated platform, and thus the railing would be a part of the vessel. The presence or absence of a railing is a question of seaworthiness, first and foremost. That a handrail installed on the elevated platform would have created a pinch point at which injuries were likely to occur relates only to the issue of the seaworthiness of the vessel, not to negligence. If the railing had been present, Mr. Parfait might not have fallen to the drill floor, but he might have sustained another injury from being pinched against the handrail as he worked with the lead tong on the vessel doing his job.[2] Each of Mr. Parfait's co-workers made statements that supported his claim that running the inner string from the platform was hazardous; but each one testified that the work could be done safely with the equipment provided. Further, they agreed that having a railing on the platform (or requiring a floor hand to wear a safety restraint) would have been impractical and potentially more hazardous to the floor hand.
Mr. Parfait did not allege in his pleadings or argue at trial that the platform was not an appurtenance to the vessel. The un-objected to instructions to the jury regarding unseaworthiness stated: "Plaintiff *488 asserts that the TRANSOCEAN RATHER was unseaworthy because the work stands were not properly and safely designed for the work plaintiff was performing at the time of the accident."
The only cases I can locate where a vessel may be found seaworthy yet the vessel owner is negligent are those in which an injury-causing foreign substance (e.g., grease or water) was on the vessel and the vessel owner did not remediate the problem. In such a case the vessel may be seaworthy and the vessel owner negligent. Such is not the situation in the case at bar.
The majority notes that Mr. Parfait argues that Transocean was negligent for reasons other than the condition of the work platform, to-wit, (1) failing to recommend to Shell that it use an alternative method for installing the wellhead (thereby precluding the need for floor hands to stand on an elevated platform) consisting of a recessed floor plate or "bucket;" (2) failing to install handrails; (3) requiring floor hands to wear safety harnesses; and (4) failing to construct a more "purpose built" platform. Each of these items of alleged negligence, however, are so integrally related to the question of the reasonable fitness of the vessel and its appurtenances and that the vessel, its equipment, and appurtenances need not be perfect, but only reasonably fit for its intended use, that for all intent and purposes the finding by the jury of seaworthiness in this case precludes a finding of negligence. The mere existence of a safer alternative does not ipso facto render a thing unreasonably dangerous or present an unreasonable risk of harm. Dorsey v. J. Ray McDermott, Inc., 2003-2264 (La.App. 1 Cir. 6/25/04), 886 So.2d 482. Mr. Parfait's arguments, especially in view of his failure to appeal the seaworthiness issue, reduce his suggestions of why independent negligence exists a to mere red herrings.
Speculation, guessing, or a mere possibility is insufficient to sustain a verdict. To uphold the jury's finding of negligence, the majority erroneously speculates that Mr. Parfait would have sustained no injury by falling if a railing was present, thereby ignoring the possibility of other types of injuries.
I would, accordingly, absolve Transocean of liability.
GORBATY, J., concurs in part and dissents in part.
I respectfully concur in part and dissent in part for the same reasons assigned by Judge Tobias.
LOMBARD, J., concurs in part and dissents in part for the reasons assigned by Judge BELSOME.
BELSOME, J., concurs in part and dissents in part.
I respectfully concur with the majority's finding that Mr. Parfait was entitled to a jury trial. Additionally, I respectfully concur with the majority's decision to absolve Shell of liability, pursuant to the jury's determination that the Rather was seaworthy. With regard to the majority's determination that the trial court's limitation of the cross-examination of Mr. Parfait's experts did not amount to reversible error, I respectfully concur. Likewise, I respectfully concur with the majority's decision that the presentation of evidence of other drilling projects by Mr. Parfait was harmless error, if any.
Finally, I also respectfully concur with the majority's finding that the jury's determination that the Rather was seaworthy had no effect with regard to the jury's finding of negligence on the part of Transocean. The majority correctly holds that a *489 reasonable basis exists upon which the jury could have found that Transocean acted negligently, as Jones Act negligence and unseaworthiness are separate and distinct causes of action with differing standards of proof, a principal that has been recognized by both the United States and Louisiana Supreme Courts, as well as this Court. See, e.g., Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971); Griffin v. LeCompte, 471 So.2d 1382, 1387 (La.1985); Wright v. Ocean Drilling and Exploration Co., 461 So.2d 1084, 1089 (La.App. 4 Cir.1984)("Theories of unseaworthiness and negligence are two separate and distinct basis of liability. . . .' [I]n view of the decisions in this court over the last 15 years, we can find no room for argument as to what the law is. What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence.'") (quoting Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 551, 80 S.Ct. 926, 932-933, 4 L.Ed.2d 941 (1960))(emphasis in original).[1] Accordingly, without delving into the extremely speculative issue of whether or not handrails should have been installed on the elevated platform, it is clear that the jury could have determined that Transocean acted negligently in any number of ways, thereby causing and subsequently exacerbating Mr. Parfait's injuries, independently of any issues regarding the Rather's alleged unseaworthiness.
For instance, Anthony Dorsey, the assistant driller on duty the day Mr. Parfait suffered his injuries, testified at trial that he had previously performed work with tongs from the vessel floor rather than from the elevated platform; thus, the jury could have determined that Transocean was negligent in failing to instruct Mr. Parfait as to a method by which the tongs could be operated from the floor rather than from the elevated platform, or that Transocean was negligent in failing to establish a means by which Mr. Parfait could perform his work on the deck level, as opposed to the added hazard of operating the tongs from the elevated platform.[2] *490 The jury also could have concluded that Transocean acted negligently by not providing or requiring Mr. Parfait to wear a safety harness (or some other type of fall arrest device) on the platform, which the jury could have determined was not an appurtenance to the vessel and therefore did not have any effect on the Rather's seaworthiness. Additionally, the jury could have found that Transocean was negligent in ordering Mr. Parfait to perform his duties from the workstands when he had not previously worked with tongs on an elevated platform, although he had been employed with Transocean for approximately three years. Finally, the jury could have also determined that Transocean's insistence upon returning Mr. Parfait to the vessel immediately following his surgery, rather than allowing him to remain under a physician's care in the hospital until he fully recovered, played a significant role in his subsequent infection and resulting surgeries.[3] Therefore, the jury could have and likely did find that Transocean was negligent for numerous reasons other than the presence or absence of handrails on the elevated platform; indeed, the jury's finding that the Rather was seaworthy supports this position.
For this reason, I also agree with the majority's application of Brunner v. Maritime Overseas Corp., 779 F.2d 296 (5th Cir.1986) to the facts of this case. Like Brunner, in the case sub judice, a vessel owner's negligence and lack of reasonable care resulted in an unsafe condition, which caused an employee's injuries. Simply because Mr. Parfait's fall was not the result of an "injury-causing foreign substance," the findings of Brunner are not thereby rendered inapposite, as the other dissenting opinion asserts.
Likewise, I disagree with the dissent's assertion that the majority's application of Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 1997 A.M.C. 1521 (5th Cir.1997) to the instant case is erroneous. Negligently failing to properly train an employee, the plaintiff's allegation in Gautreaux, is analogous to negligently instructing an employee who has not previously operated tongs from an elevated platform to do so when the same operation could have been performed from the floor. Moreover, in Gautreaux, the Fifth Circuit affirmed a determination of damages that was the result of a jury's finding that the vessel on which Mr. Gautreaux worked was seaworthy, but that his employer was negligent, precisely the scenario in the instant case.[4] *491 Gautreaux, 107 F.3d 331, 339. It is unclear why the dissenting opinion asserts that Gautreaux "stands for the proposition that `the standard of care to be attributed to either an employer or an employee [in a Jones Act case of negligence] is [not] anything different than ordinary prudence under the circumstances,'"; the majority's opinion does not dispute this proposition.
Finally, the dissenting opinion erroneously maintains that the resolution of the instant case turns on the vessel's lack of handrails coupled with the jury's finding of seaworthiness; to the contrary, the crux of this case involves negligence on the part of Transocean that caused and subsequently exacerbated Mr. Parfait's injuries, and not the presence or absence of handrails.
With respect to the issue of damages, I respectfully dissent from the majority's decision to drastically reduce the award for general damages. It is a well-settled principle under Louisiana law that the factfinder is vested with wide discretion with regard to an award for general damages, and that such awards are not to be disturbed on appeal absent an abuse of that vast discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). In Youn, the Louisiana Supreme Court observed:
The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id. The majority's opinion that "despite [Mr. Parfait's] physical and emotional constraints,"[5] he "is able to perform the daily activities of his life, including dressing, bathing and feeding himself, cooking, cleaning and driving a vehicle" and that Mr. Parfait "has been able to maintain a relationship with his fiancée and actively participate in the lives of his three children" is not a sufficient basis upon which to drastically reduce the jury's $1,000,000 award for general damages to a mere $300,000. Louisiana jurisprudence clearly dictates that appellate courts may only reduce an award for general damages when the award is higher than an amount which a reasonable factfinder could determine for the effects of the particular injury to the particular plaintiff under the particular circumstances of the case. Reck v. Stevens, 373 So.2d 498, 501 (La.1979); Suire v. LCS Corrections Services, Inc., XXXX-XXXX, pp. 5-6, (La.App. 3 Cir.2006), 930 So.2d 221, 226.[6] The majority has *492 cited no authority to support its assertion that the jury's award in this case is beyond that which any rational finder of fact could have determined to be appropriate under these particular circumstances. Therefore, I cannot agree that the jury abused its discretion in making the general damages award, and would accordingly let the $1,000,000 award stand.
Finally, I respectfully dissent from the majority's determination that the trial court erred in excluding evidence related to Mr. Parfait's previous injury. It is within the trial court's discretion to exclude evidence if its prejudicial value outweighs the probative value, even if the evidence is relevant. See, e.g., Hebert v. Angelle, 600 So.2d 832 (La.App. 3 Cir. 1992); La.Code Evid. art. 403. Additionally, the cases cited by the majority in support of their contention that the trial court erred by excluding evidence regarding Mr. Parfait's prior injury and claims are inapposite to the facts of the instant case. First, the majority notes that Ronquillo v. Belle Chase Marine Transportation, Inc., 629 So.2d 1359, 1362 (La.App. 4 Cir.1993) stands for the proposition that evidence regarding prior claims and injuries may be admissible for credibility purposes and/or to establish a causal relationship between the present disability and the previous accident. In this case, Mr. Parfait did not claim that any of his injuries on the Rather aggravated or were related to any of the injuries from his previous accident. Moreover, Mr. Parfait was not suffering from depression at the time of the accident. Finally, Mr. Parfait was not, as was the Plaintiff in Ronquillo, undergoing treatment for any of his previous injuries at the time of the accident on the Rather. Ronquillo, 629 So.2d at 1361. Additionally, the physicians who evaluated the Plaintiff in Ronquillo offered conflicting views as to whether or not the Plaintiff's depression had resolved prior to the injury at issue. Id. at 1363. This Court ultimately concluded in Ronquillo that "[t]he jury could have believed that plaintiff's psychological injury  his depression  was a life-long condition." Id. at 1364. Thus, it is equally likely that the jury in this case found that Mr. Parfait's depression was not a "life-long condition," but that it had, in fact, been resolved subsequent to treatment *493 for his prior injuries, and that he would not have suffered from depression again but for his injuries sustained on the Rather.
Likewise, Page v. Guidry, 506 So.2d 854, 857 (La.App. 1 Cir.1987), the other case cited by the majority, can also be distinguished from the facts of the case at bar. In Page, the Plaintiff submitted claims for the same medical expenses that had been submitted for recovery in two prior settlements, clearly putting the Plaintiff's credibility at issue. By contrast, Mr. Parfait's physical injuries resulting from his fall on the Rather were completely separate from his previous injuries; he made no duplicative claims in this case that would put his credibility at issue. With regard to his psychological injuries, as previously noted, the jury could have concluded that his depression had resolved itself prior to his injuries on the Rather, as he was not being treated for depression at the time of his accident on the Rather. Therefore, I agree with the trial court's holding that evidence of Mr. Parfait's prior injuries would have been unfairly prejudicial; accordingly, I do not believe that the trial court erred in granting Mr. Parfait's motion in limine excluding evidence of Mr. Parfait's prior accident and disability. Additionally, because I do not agree that the trial court committed legal error, I do not agree that a de novo review of the record is necessary in this case.
Likewise, I respectfully dissent from the majority's reduction of Mr. Parfait's future medical expenses and future wage loss awards; I cannot say that the jury was manifestly erroneous in making these awards. The majority notes that Mr. Parfait's expert, Dr. Rice, estimated that Mr. Parfait's future medical expenses would be $477,330.00. The majority criticizes this figure because "the estimate was based on Mr. Parfait's continuing his present medications and doctor visits for his future life expectancy with no reductions over time." The actual amount awarded by the trial court for future medical expenses, however, was only $250,000.00. Yet the majority wishes to further reduce this award, inexplicably, to only $100,000.00.
With regard to the majority's reduction of the award for future wage loss, I also disagree. After recovering from his previous injury, Mr. Parfait returned to work several years later with Transocean at a much higher salary and with the potential to significantly increase his pay level. Moreover, the majority acknowledges that a promotion to derrick man was imminent, had Mr. Parfait not suffered the injuries resulting from his fall on the Rather.[7] It was within the jury's discretion to accept Dr. Rice's estimates for Mr. Parfait's future wage loss and make an award accordingly. Therefore, I would not reduce the jury's award for future wage loss.[8]
In conclusion, although we cannot say with certainty which particular act of negligence the jury attributed to Transocean, the record is replete with substantial facts *494 that support a finding of negligence against Transocean. Because the trial court did not erroneously exclude evidence of Mr. Parfait's previous accident and claims, the majority's de novo review was inappropriate in this case, particularly because the de novo review was used as a vehicle to mention Mr. Parfait's previous settlement  the basis upon which the majority deems it appropriate to reduce Mr. Parfait's award for future wage loss. Additionally, the majority substitutes its judgment for that of the factfinder by declaring that $300,000.00 is a suitable amount for general damages, thereby reducing the award by more than half (and reducing the future medical expenses award), because Mr. Parfait might recover from his depression, and because he can clothe, feed, and drive himself. In reducing these awards, the majority supersedes the trial court's vast discretion and denies Mr. Parfait the damages that were rightfully awarded to him by the jury.
NOTES
[1] Parfait v. Transocean Offshore, Inc., XXXX-XXXX, XXXX-XXXX (La.4/05/07), 953 So.2d 57, 58.
[2] Robert Borison is referred to as Robert Boreson in the trial transcript.
[3] At the time of Mr. Parfait's accident, La. C.C.P. art. 1732(6) provided:

A trial by jury shall not be available in:
(6) A suit on an admiralty or general maritime claim under federal law that is brought in state court under a federal "saving to suitors" clause, if the plaintiff has designated that suit as an admiralty or general maritime claim.
[4] La. C.C.P. art. 1733 C provides:

The pleading demanding a trial by jury shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury.
[5] The trial court judgment was signed on February 10, 2004, but was amended on April 20, 2004 to correct an error in calculation.
[6] 1999 La. Acts, No. 1363, § 1, effective August 15, 1999, repealed this prohibition; Section 2 of Act 1363 made the repeal applicable to causes of action arising on or after its effective date.
[7] At the time this suit was filed and tried, Rule 9(h) of the Federal Rules of Civil Procedure provided:

Admiralty and Maritime Claims. A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 389(e) [no jury trial], 82, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not. The amendment of a pleading to add or withdraw an identifying statement is governed by the principles of Rule 15. A case that includes an admiralty or maritime claim within this subdivision is an admiralty case within 28 U.S.C. § 1292(a)(3).
[8] The well prognosis is the detailed plan of the well, which drilling engineers draft in the project's beginning stage.
[9] In the assignment of error, Transocean complains of the trial court's limiting the defendants' cross-examination of the plaintiff's experts, but only addresses the limited cross-examination of Mr. Borison in its appellate brief.
[10] A diagnostic test using an instrument referred to as an electromyograph to simultaneously record visual and sound electric waves associated with the activity of skeletal muscle.
[11] The parties stipulated that Transocean paid Mr. Parfait $19,965.00 in maintenance benefits.
[12] The parties stipulated that the unpaid medical expenses totaled $5,994.11.
[13] General damages include past and future pain and suffering, both mental and physical disability, impairment and loss of enjoyment of life.
[14] Neither Transocean nor Shell appealed the jury's finding of no negligence on the part of Mr. Parfait. Thus, in light of Shell's dismissal, the remaining 25% of fault must be cast against Transocean.
[1] We are bound to follow the Louisiana Supreme Court's decision on rehearing in Parker v. Rowan Cos., Inc., 599 So.2d 296 (La. 1992) (preserving the plaintiffs right to a jury trial in a case in which the plaintiff asserts both a Jones Act and general maritime claim subsequent to his injury and the filing of his initial petition is procedural in nature because he had a right to a jury trial under federal law), which appears to be in conflict with Cambridge Comer Corp. v. Menard, 525 So.2d 527 (La. 1988) (holding that an increase in the threshold jurisdictional amount to assert a right to a jury trial from $10,000 to $20,000 is a substantive change in the law).
[2] Mr. Parfait's version of the facts (although different versions appear of record) indicates that his use of lead tongs in conjunction with another co-employee's use of the bottom tongs must have caused his fall to the drill deck.
[1] Other examples of courts upholding this principle are as follows: Olsen v. American S.S. Co., 176 F.3d 891, 894, 2000 A.M.C. 90 (6th Cir.1999)(stating that a seaman has three causes of action available to him: first, an action for maintenance and cure; second, an action for unseaworthiness; and third, a negligence action under the Jones Act); Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 100 (5th Cir.1985)(finding that "[w]hile the facts that give rise to unseaworthiness claims sometimes support Jones Act negligence claims, each is a distinct claim"); Chisholm v. Sabine Towing & Transp. Co., Inc., 679 F.2d 60, 62 (5th Cir. 1982)("Jones Act negligence and unseaworthiness are two separate and distinct claims. . . . This court recognizes [these] two different standards of causation."); Watson v. Oceaneering Intern., Inc., 387 F.Supp.2d 385, 390 (D.Del.2005)("Under the Jones Act, a seaman can maintain a cause of action where `an employer's failure to exercise reasonable care causes a subsequent injury even where the employer's negligence did not render the ship unseaworthy.'")(quoting Ferrara v. AV Fishing, Inc., 99 F.3d 449, 453, 1997 A.M.C. 944 (1st Cir.1996)) (emphasis added).
[2] Upon direct examination by Darryl Phillips, Mr. Dorsey's testimony regarding his experience working with tongs from the deck or vessel floor is as follows (emphasis added):

Q: Okay. Isn't itisn't it easier to operate and to latch the pipe if you're doing it on the deck level and not on an elevated surface?
A: I think it takes the same amount. Personally, having operated tongs myself, it takes the same amount of force.
Q: Not force. Let's talk about the ability to do the job. I mean, if you'reif you're working from a platform that's four feet high, you've got to watch out for the edge, [be]cause there are nothere are no railings around this thing, am I correct, sir?
A: You're correct.
Q: Okay. So, you've got to not only operate the tong, you've got to watch out for stepping on the edge, right?
A: That's correct.
Q: So, ifbut if you're on the deck, or floor, if you're on the deck you don't have to worry about that, you can move around with relative safety, correct?
A: That's correct.
Q: The elevated platform creates an additional hazard, a fall hazard, doesn't it?
A: That's correct.
Q: Okay. And it's safer to do the job . . . from the deck, rather than doing it from the elevated platform?
A: I won't argue with that.
Q: Okay.
A: I agree with that.
[3] The jury could have also determined that Transocean, by transporting Mr. Parfait back to the vessel in an apparent effort to avoid reporting a lost time accident, failed in their duty to take reasonable care under the circumstances and therefore acted negligently by exacerbating Mr. Parfait's injuries. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335-336 (5th Cir.1997)(holding that pursuant to the Jones Act, the duty of care owed by an employer to an employee is the duty to take reasonable care under the circumstances). We also note that no physician attended to Mr. Parfait when Transocean returned him to the Rather immediately after his surgery; the vessel only had a medic on board for this purpose.
[4] The Court in Gautreaux affirmed the district court's determination of the amount of damages, vacated the district court's judgment as to comparative fault (the jury assigned 95% of the fault to Mr. Gautreaux's employer and 5% of the fault to Mr. Gautreaux), and remanded the case for a determination of the comparative fault, "if any," of Mr. Gautreaux. Gautreaux, 107 F.3d at 339 (emphasis added). It should be reiterated that the jury apportioned 0% of the fault in this case to Mr. Parfait, a finding which neither Shell nor Transocean appealed.
[5] The majority specifically acknowledges that Mr. Parfait will "continue to suffer pain and discomfort for the rest of his life"; that he will "be limited to sedentary activities"; that in addition to being permanently physically disabled, Mr. Parfait cannot participate in his "favorite activities," fishing, hunting, and bowling; and that Mr. Parfait suffers from acute depression.
[6] Moreover, this Court, in Harvey v. Cole, XXXX-XXXX, p. 15-16 (La.App. 4 Cir. 1/23/02), 808 So.2d 771, 782-783, a suit resulting from injuries sustained in an automobile accident by three plaintiffs, upheld all general and special damages awarded to plaintiff Randolph Polk. The awards totaled $2,075,858.00 for back, knee and neck injuries that Mr. Polk sustained in the accident. Id. Regarding the extremely large award, this Court stated: "we find that the awards for general damage awards [sic], although very high, are not so excessive as to constitute an abuse of the great, even vast, discretion afforded to the trier of fact in the assessment of general damages." Id. (emphasis supplied). As a result of the accident, Mr. Polk had one lumbar fusion surgery, suffered a cervical herniated disc and torn lateral meniscus in the right knee, and incurred a 15 to 20 percent total body disability as a result of the accident. Id.

In Mr. Parfait's case, he also suffered a torn medial meniscus, but not only in one knee, as did Randolph Polk, but in both knees. Mr. Parfait underwent not one surgery, as did Mr. Polk, but five surgeries on his wrist, in addition to undergoing extensive physical therapy. Moreover, the majority specifically acknowledges that Mr. Parfait is "totally and permanently physically disabled," not 15 to 20 percent disabled, as Mr. Polk was in Harvey. By any standard, Mr. Parfait suffered greater injuries and pain and suffering, as well as complete and total disability, than did the plaintiff in the Harvey case, wherein this Court did not hesitate to uphold an award in excess of two million dollars.
Finally, it is important to note that this Court in Harvey upheld all general and special damages awarded to each of the three plaintiffs, reducing only a general damage award to plaintiff Leroy Treadwell because he "did not establish through medical testimony that the herniated discs in his cervical spine were related to the. . . . accident," Id.; such is not the scenario in the instant case.
Accordingly, the same deference should accordingly be afforded the trial court in this case, and the general and special damages rightfully awarded to Mr. Parfait should remain undisturbed.
[7] As the majority notes, Mr. Parfait's economist estimated his future work life expectancy of 10.21 years, while the defendants' expert estimated it at 9.8 years; it seems clear that Mr. Parfait would have been able to work for at least 10 more years, if not more, but for the injuries he suffered on the Rather.
[8] The majority reduced the award for future wage loss because "Mr. Parfait recovered a substantial amount for future loss of wages as a result of his accident in 1988." The majority is thus of the opinion that to award the amount suggested by Dr. Rice ($5,000.00 more than was actually awarded by the trial court) "would effectively allow Mr. Parfait to recover twice for future lost wages." As previously stated, I do not agree that the trial court erred in excluding evidence of Mr. Parfait's previous accident and injury; therefore, no de novo review is necessary in this case.